# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSHUA AARON and ALL U CHART, INC., <br><br>           Plaintiffs, <br><br> vs. <br><br> PAMELA J. BONDI, in her official capacity as Attorney General, United States Department of Justice; KRISTI L. A. NOEM, in her official capacity as Secretary of the United States Department of Homeland Security; TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; THOMAS D. HOMAN, in his official capacity as White House Border Czar, and JOHN DOE FEDERAL OFFICIALS 1–10, each in their official capacities, <br><br>           Defendants. | Civil Action No. 25-CV-4250 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**SHER TREMONTE LLP**
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600

*Attorneys for Plaintiffs Joshua Aaron and ALL U Chart, Inc.*

## NATURE OF THE ACTION

1.      On October 2, 2025, Attorney General Pamela J. Bondi publicly touted her use of state power to secure the removal from the Apple App Store of an iPhone application called "ICEBlock," declaring: "***We reached out to Apple today demanding they remove the ICEBlock app from their App Store — and Apple did so.***"  With this admission, Attorney General Bondi made plain that the United States government used its regulatory power to coerce a private platform to suppress First Amendment-protected expression.

2.      In early 2025, Joshua Aaron created ICEBlock ("ICEBlock," or the "App"), which allows members of the public to report publicly observable locations of United States Immigration and Customs Enforcement ("ICE") agents.  The App was designed to facilitate community sharing of publicly available information.

3.      ICEBlock operates as a crowdsourced platform: its users are the sole source of all reported sightings.  Aaron designed the App to be accessible to anyone with an iPhone, regardless of language proficiency or technical experience. To report a sighting, a user simply taps the location of observed ICE activity on the map, enabling the community to stay informed about publicly observable ICE activity in their area.

4.      Aaron developed ICEBlock in response to the Trump Administration's unprecedented campaign to arrest, detain, and deport immigrants.  He feared that Trump's incendiary rhetoric about immigration would lead to aggressive, indiscriminate enforcement of immigration laws, exposing immigrants and citizens alike to violence and rampant violations of their civil liberties.  Aaron was right.

5.      On the President's first day in office in his second term, the Administration issued a flood of executive orders, proclamations, memoranda and public statements making its goal

1

plain: detain and deport as many people as quickly as possible, by whatever means necessary. The Administration drastically increased its immigration enforcement capabilities by expanding its force of ICE agents, deputizing state and local law enforcement officials to act as ICE agents, and mobilizing the military to assist them. It built new detention facilities and repurposed military installations, like Guantanamo Bay, as enforcement outpaced detention capacity. And the Administration imposed arrest quotas on ICE to hasten the mass expulsion of those born outside of the United States (and the threatened expulsion of those born here to foreign parents, in an attack on birthright citizenship).

6.      The Administration's immigration crackdown has led to the use of indiscriminate enforcement tactics and a diffusion of responsibility. Immigration enforcement agents are increasingly hiding their faces by wearing masks and evading identification by refusing to provide their names, badge numbers, and agency affiliation. ICE agents in roving patrols are stopping, questioning, and detaining people based on how they look, the language they speak, or the place they work. The Administration has defended the widespread use of these radical enforcement tactics in courtrooms around the country.

7.      After witnessing President Trump's promises of a mass deportation campaign, Aaron submitted ICEBlock to Apple for hosting on Apple's App Store so that the App could be available for free to all iPhone users. By April 2025, a few months after the beginning of Trump's second term, ICEBlock was available for download on the Apple App Store. Toward the end of June 2025, amidst increasing ICE raids, ICEBlock had gained approximately 20,000 users.

8.      On June 30, 2025, CNN published a feature about ICEBlock, including an interview with Aaron, that caused a major uptick in downloads. ICEBlock soon became one of the most-downloaded apps in the entire Apple App Store, rapidly gaining hundreds of thousands of users.

9.      The same day CNN aired its story, senior officials in the Trump Administration launched a coordinated campaign of retaliation against Aaron and CNN, spreading false claims about ICEBlock.   Acting ICE Director Todd Lyons falsely asserted that ICEBlock "invit[es] violence" and suggested that the Department of Justice ("DOJ") should pressure CNN to stop reporting favorably on the App.   Tom Homan, the White House "Border Czar," echoed Lyons's call for a DOJ investigation.   Secretary of Homeland Security Kristi Noem went further, suggesting that creating or using ICEBlock "looks like obstruction of justice" and amplifying demands that DOJ investigate and prosecute CNN for its reporting.   Answering these calls, Attorney General Bondi publicly implied that Aaron had committed a federal crime by creating ICEBlock and warned Aaron that he was under investigation and had better "***watch out, because that's not protected speech***."

10.      Despite the Trump Administration's torrent of threats and false claims about ICEBlock, Aaron did not yield.   He did not take down or disable the App.   He believes that speech about publicly observed law and immigration enforcement activity—the expression enabled by ICEBlock—lies at the heart of the interests the First Amendment was intended to protect.   He is right about that, too.

11.      The Bill of Rights—including the First Amendment—was crafted precisely to safeguard the People's ability to question authority, expose governmental abuse, and hold public officials accountable: a reflection of the founders' belief that an informed and vocal citizenry is the ultimate guardian of liberty.   Drawing on colonial experiences of religious persecution, censorship, and compelled orthodoxy, the First Amendment's guarantees of free expression, free press, and free exercise of religion reflected the founders' conviction that true public safety depends on individual conscience and open debate.

12.    Moreover, the dangers of state coercion preoccupied the founders, who had lived under British rule marked by general warrants, customs searches, and military enforcement of civil law. *Cato's Letters* and *The Federalist Papers* repeatedly warn that liberty could be lost not only through invasion, but also through domestic despotism. Anti-Federalists especially feared that a national government with its own officers and marshals would become an "engine of oppression."

13.    Since its enactment, the First Amendment has also protected vigorous public debate prompted by the government's reaction to immigration, the same speech at issue in this case. For centuries, speech about immigration has shaped the law and inspired movements that reflect the nation's ongoing struggle to balance liberty, security, and equality. For these reasons and more, Aaron's creation, distribution, and promotion of ICEBlock is plainly lawful and protected by the First Amendment.

14.    When neither Aaron nor Apple withdrew ICEBlock in response to the Administration's threats and complaints, the Administration escalated its pressure campaign. Trump Administration officials, including Attorney General Bondi, privately demanded that Apple remove ICEBlock from the App Store. And on October 2, 2025, when ICEBlock had amassed more than one million users, the government succeeded in its campaign to coerce Apple into removing ICEBlock from the App Store. For what appears to be the first time in Apple's nearly fifty-year history, Apple removed a U.S.-based app in response to the U.S. government's demands.

15.    Aaron received word out of the blue from Apple—vaguely citing information obtained from law enforcement—that the App would no longer be available on the App Store. The law enforcement source of this censorship quickly became clear: as Attorney General Bondi put it in a Fox News interview that day, "We reached out to Apple today demanding they remove the ICEBlock app from their App Store – and Apple did so." In subsequent press appearances and

public statements, Administration officials have not denied forcing Apple's hand: rather, they have heralded it as a victory.

16.     This lawsuit challenges these government officials' unconstitutional threats and demands against Apple, which pressured it to remove the ICEBlock app from the App Store.  In particular, Attorney General Bondi's coercion of Apple has censored Aaron and ALL U Chart, Inc., which owns ICEBlock's intellectual property, by making ICEBlock—their speech— unavailable to the public.

17.     This lawsuit also challenges the unlawful threats made by Attorney General Bondi, Secretary of Homeland Security Kristi Noem, ICE Acting Director Todd M. Lyons, and White House Border Czar Tom Homan to criminally investigate and prosecute Aaron for his role in developing ICEBlock.  These threats were intended and designed to chill Aaron and others from engaging in expressive activity—specifically, sharing information about publicly observable law-enforcement actions—and to deter technology companies and journalistic institutions from supporting, amplifying, or facilitating such speech.

18.     Plaintiffs ask this Court to declare unlawful Defendants' coercion of a private party to remove ICEBlock from the App Store and to enjoin Defendants from threatening or pressuring any would-be distributor of ICEBlock.  Aaron further seeks a declaration that Defendants' threats of prosecution directed at him for developing, distributing, and promoting ICEBlock violated the First Amendment, and an injunction prohibiting Defendants from threatening, investigating, or prosecuting him for these protected expressive activities.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The action arises under federal law, including the United States Constitution.  This Court may grant

declaratory relief, injunctive relief, and other appropriate relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and this Court's inherent equitable jurisdiction.

20.     Venue is proper in the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(e)(1), because a substantial part of the events or omissions giving rise to the claims occurred within this District. Defendants are located and operate in their official capacity in this District. On information and belief, Defendant Bondi targeted Apple with the demand that the company remove and refuse to allow the App in its App Store while in this District. On information and belief, Defendants threatened Aaron with criminal investigation and prosecution for submitting the App and distributing it through the App Store while in this District.

## THE PARTIES

### I.     Plaintiffs

21.     Plaintiff Joshua Aaron Feinstein ("Aaron") is an individual and citizen of the State of Texas, residing in Austin, Texas. Aaron is a software developer and the founder and developer of ICEBlock.

22.     Plaintiff ALL U Chart, Inc. ("ALL U Chart") is an S corporation duly organized and existing under the laws of the State of Texas, with its principal place of business located in Austin, Texas. At all times relevant to this Complaint, ALL U Chart has been the owner of all intellectual property associated with the ICEBlock application. For convenience and to avoid ambiguity, all references herein to "ICEBlock," or the "App," shall mean the ICEBlock application and all related intellectual property owned by ALL U Chart.

### II.     Defendants

23.     Defendant Pamela J. Bondi ("Bondi") is the Attorney General of the United States and is sued in her official capacity for actions taken under color of federal law that are the subject

of the claims in this Complaint. The Attorney General oversees the enforcement of federal criminal statutes. As the head of the DOJ, Bondi supervises its officers and employees, including the United States Attorneys.

24.     Defendant Kristi L. A. Noem ("Noem") is the Secretary of the United States Department of Homeland Security ("DHS") and is sued in her official capacity for actions taken under color of federal law that are the subject of the claims in this Complaint. As the head of DHS, Noem is responsible for administering and enforcing the nation's immigration laws.

25.     Defendant Todd M. Lyons ("Lyons") is the Acting Director of ICE and is sued in his official capacity for actions taken under color of federal law that are the subject of the claims in this Complaint. As the Acting Director of ICE, Lyons oversees the agency's enforcement of immigration laws, criminal investigations, and detention and removal operations.

26.     Defendant Thomas D. Homan ("Homan") is the White House "Border Czar" responsible for overseeing immigration enforcement policy and is sued in his official capacity for actions taken under color of federal law that are the subject of the claims in this Complaint.

27.     Defendants John Doe Federal Officials 1–10 (the "Doe Defendants") are federal officers or employees whose identities and specific official titles are presently unknown to Plaintiffs. Each Doe Defendant is or was responsible, in whole or in part, for implementing, enforcing, supervising, or otherwise carrying out the federal policies or actions challenged in this Complaint. The identities of these officials cannot now be determined because the relevant information is within the possession of the federal government. Plaintiffs will amend this Complaint to substitute their actual names and titles once they become known through discovery or government disclosure. Each Doe Defendant acted under color of federal authority and within the scope of official duties and is sued solely in his or her official capacity for prospective

declaratory and injunctive relief.

## FACTUAL ALLEGATIONS

**I.      President Trump's Immigration Policies and Mass Deportation Promises Set the Stage for ICE's Sweeping, Indiscriminate Enforcement Tactics**

28.      The Trump Administration is engaged in immigration enforcement operations that involve aggressive police actions against people living in the United States regardless of citizenship or immigration status.  These operations have led to widespread and well-documented civil rights violations against citizens, lawful residents, and undocumented immigrants alike, causing serious concern among members of the public, elected officials, and federal courts.

29.      During his first term, President Donald J. Trump issued Executive Order ("EO") 13,768, "Enhancing Public Safety in the Interior of the United States."  The order vastly broadened agency removal priorities to include any eligible person, including those merely charged with, but not convicted of, a crime, or anyone deemed by an immigration officer to "pose a risk to public safety."  As a result, non-criminal arrests rose significantly throughout those four years.

30.      Trump's campaign for a second term placed immigration policy, and particularly a promise of mass deportation, at its core.  In campaign speeches, Trump frequently warned of a dangerous "migrant invasion," alleging that immigrants are "poisoning the blood of our country . . . pouring into our country."  Trump made incendiary, baseless claims about entire migrant populations, claiming, among other things, that Haitian migrants eat people's pets, that Arab and Muslim refugees are terrorists, and South American immigrants are recent escapees and parolees from prisons and mental institutions.  Trump's campaign rallies, speeches, and merchandise prominently and frequently featured the slogan "MASS DEPORTATION NOW!"

31.      Then-candidate Trump pledged that "on day one, I will launch the largest deportation program of criminals in the history of America."  He foreshadowed deploying the

National Guard and potentially active-duty military to support removals, stating, "[w]hen we talk military, generally speaking, I talk National Guard … [i]f they weren't able to [handle it], then I'd use the military."

32.     As part of this platform, Trump proudly rejected an enforcement focus limited to undocumented immigrants with criminal convictions.  His campaign team often referenced plans to deport "15 to 20 million" undocumented immigrants, when in fact the number of undocumented persons in the United States is far lower.

33.     On November 5, 2024, Donald Trump was elected to his second, non-consecutive term as President of the United States.  In his victory speech, he once more elevated his focus on immigration issues, acknowledging that his promises were central to his victory: "We're going to fix our borders, we're going to fix everything about our country; and we made history for a reason tonight, and the reason is going to be just that."

34.     The transition period ahead of Trump's second presidency was also marked by repeated emphasis on the deportation scheme he would implement as soon as he took office.  On November 18, 2024, Trump personally confirmed in a Truth Social post the reports that his incoming administration would declare a national emergency and use "military assets" to effectuate his mass deportation agenda:



35.     Days later, on November 24, 2024, Karoline Leavitt—then a spokesperson for the Trump transition team—stated that "President Trump will marshal every federal and state power necessary to institute the largest deportation operation of illegal criminals, drug dealers and human traffickers in American history[.]"  And in his December 2024 interview with *TIME Magazine* naming him "Person of the Year," Trump said that he considered the presence of undocumented persons "to be an invasion of our country."  He further promised that his administration would "get [the] National Guard, and we'll go as far as I'm allowed to go, according to the laws of our country."

36.     The Trump Administration launched its immigration crackdown immediately upon inauguration, memorializing Trump's incendiary campaign rhetoric about immigrants and his plans for immigration enforcement in a slew of official presidential documents issued on his first days in office.

37.     **EO 14,159, "Protecting the American People Against Invasion."**  On January 20, 2025, inauguration day, the Trump Administration published Executive Order ("EO") 14,159, titled "Protecting the American People Against Invasion."  In EO 14,159, the Trump Administration claimed the United States had recently faced "an unprecedented flood of illegal immigration," that "many" recent immigrants "present significant threats to national security and public safety" by, among other things, "committing vile and heinous acts against innocent Americans," "engaging in espionage . . . and terror-related activities."

38.     **EO 14,165, "Securing Our Borders."**  That same day, the White House also rolled out the "Securing Our Borders" EO 14,165.  The Trump Administration reiterated its claim that in recent years, the United States has "endured a large-scale invasion at an unprecedented level" of "millions of illegal aliens," including "potential terrorists, foreign spies, members of cartels, gangs,

and violent transnational criminal organizations, and other hostile actors with malicious intent."
In a companion proclamation issued that same day titled "Guaranteeing the States Protection Against Invasion" Proclamation No. 10888,90 Fed Reg. 8333 (Jan. 20, 2025), Trump declared that the "current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution" and suspended physical entry of "aliens involved in an invasion into the United States."

39.    **New DHS Directive Regarding "Sensitive Areas."**  Also on January 20, 2025, in a memorandum from DHS, the Trump Administration rescinded decades-long standing guidance issued by DHS that protected certain sensitive locations, like places of worship, from enforcement actions by ICE.  In particular, the new directive repeals expanded protections issued in 2021 that protected immigrants from enforcement actions in schools, hospitals, places of worship, playgrounds, domestic violence shelters, food pantries and other similar sites.

40.    **Immigration Detention at Guantanamo Bay**.  On January 29, 2025, the Trump Administration published a memorandum to the Secretary of Defense and the Secretary of Homeland Security directing them to "to take all appropriate actions to expand the Migrant Operations Center at Naval Station Guantanamo Bay to full capacity to provide additional detention space for high-priority criminal aliens unlawfully present in the United States, and to address attendant immigration enforcement needs identified by the Department of Defense and the Department of Homeland Security."  The memorandum claims its purpose is to "halt the border invasion," among other things.

41.    **Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua**.  On March 14, 2025, the Trump Administration issued a proclamation that calls for the arrest, mandatory detention and deportation of all Venezuelan citizens suspected

to be members of Tren De Aragua, including children as young as fourteen years old, under the Alien Enemies Act.  This proclamation has led to the detention and deportation of hundreds of Venezuelans, including, as has been widely reported, persons against whom there is flimsy evidence (or none at all) of any gang connections.

42.     Together, these directives and others guide federal agencies to expand and supercharge immigration enforcement.  The Administration has issued additional statements and orders, such as its EO purporting to rescind birthright citizenship, that made clear that its focus goes far beyond undocumented immigrants.  The Administration's directives send a clear message: the government will use every resource available to rapidly arrest, detain and deport anyone (and everyone) it can, regardless of lawful immigration or even citizenship status.

## II.     Pursuant to the Trump Administration's Immigration Policies, ICE Has Conducted—and Continues to Conduct—Raids Affecting Immigrants and Citizens Alike

43.     Within days of taking office, President Trump began carrying out the promised mass deportations.  As reported by the *Washington Post*, by January 26, 2025, the Trump Administration directed ICE to "aggressively ramp up" its daily arrests, "from a few hundred per day to at least 1,200 to 1,500" because the President was disappointed by the number and speed of deportations.  As a result, each of ICE's field offices around the country was directed to make "75 arrests per day."

44.     Pursuant to these and other policies and directives, the Trump Administration has implemented and carried out a hyperaggressive immigration enforcement policy, with immigration agents conducting large-scale stops and arrests across the country.  ICE and other immigration agents have raided farms, construction sites, restaurants, and other places of business, taking away dozens or hundreds of people at a time.  For example, on September 4, 2025, ICE raided a Hyundai plant in Georgia, arresting 475 workers.  During an October 19, 2025 raid in Idaho, immigration

agents reportedly zip-tied young children and fired rubber bullets into a large crowd. Additional high-profile ICE actions have occurred in Los Angeles, California, Chicago, Illinois, Portland, Oregon, Charlotte, North Carolina, and, most recently, New Orleans, Louisiana.

45. People who have witnessed raids, street arrests, and other actions by immigration agents have shared their experiences, photos, and videos, documenting the violence and fear that often accompany such activity. For example, the video of the arrest of Tufts University graduate student Rümeysa Öztürk on March 25, 2025, in Somerville, Massachusetts, was circulated widely online and through traditional media sources. Similarly, a video that a worker sent to his aunt of immigration agents raiding Glass House Farms in Camarillo, California, on July 10, 2025, leading to the death of one worker and the arrest of 360 others, was shared with reporters and circulated widely.

46. The large-scale nature of these raids and arrests appears to be directly connected to the immigration arrest quota imposed on ICE leadership by the Trump White House and DHS officials. As they have raced to meet these arrest quotas, immigration agents have increasingly relied on race and ethnicity to make stops and arrests, a practice the Administration has explicitly defended in litigation. They have also set up checkpoints in the middle of large cities, which put everyone at risk of being stopped and questioned.

47. These practices impose serious consequences on huge numbers of Americans. For instance, in California, immigration agents' reliance on race and ethnicity places approximately 40% of the state's population at risk of unwanted encounters—including millions of U.S. citizens along with non-citizens who have lawful immigration status.

48. The Trump Administration's mass deportation operations have greatly increased the likelihood that members of the public—including immigrants legally in the country and U.S.

citizens—will encounter these activities.

49.     As they expand these patrols and arrests nationwide, immigration agents are increasingly wearing masks to obscure their faces and refusing to provide their names, badge numbers, or even to identify the agency to which they belong.  These masked policing tactics are magnifying the fear caused by the intense and broadly targeted mass arrest campaign.

50.     ICE agents' practice of wearing masks during arrests has led to particularly vociferous criticism.  As one federal judge noted in an opinion discussing Öztürk's arrest, "***To us [Americans], masks are associated with cowardly desperados and the despised Ku Klux Klan. In all our history we have never tolerated an armed masked secret police.***"  *Am. Ass'n of Univ. Professors v. Rubio*, No. CV 25-10685-WGY, 2025 WL 2777659, at *40 (D. Mass. Sept. 30, 2025).

51.     The Administration's policy of mass deportation and the means by which it is attempting to effectuate it remain topics of intense public debate, nearly one year into President Trump's second term.  The Administration's activities in this area have drawn protests, in response to which law enforcement has engaged in increasingly aggressive responsive tactics, including the unprovoked use of pepper spray and tear gas, shattering car windows, arresting parents and leaving young children unaccompanied, and, in a recently reported event, driving an arrestee's car away from the scene of arrest with the arrestee's young toddler still strapped into a car seat in his vehicle.

52.     On November 6, 2025, a federal district court in the Northern District of Illinois ruled that federal immigration agents' use of excessive force against civilians in Chicago "shocks the conscience" and enjoined the use of tear gas and other crowd control methods within the district.  Protestors against the Administration's crackdown in Chicago, as well as other cities, have described being attacked, brutalized, and traumatized by their interactions with immigration

agents.

53.     These widely reported events have led some people—regardless of immigration or citizenship status—to want to avoid areas of federal immigration enforcement activities altogether. They have also resulted in situations where members of the public may wish, when enforcement activity becomes visible in public spaces, to observe, record, or lawfully protest against such activity.

### III.    Aaron Develops ICEBlock as a Tool for Community Information and Awareness Regarding ICE Presence Amid the Trump Administration's Mass Deportation Campaign

54.     Aaron has been resolute about standing up for what is right for as long as he can remember.  His experience being raised in a Jewish household instilled in him a deep commitment to political activism and social justice.  Encounters with Holocaust survivors during his upbringing left a lasting impression, shaping his commitment to use his abilities to advocate for the protection of civil liberties.

55.     Born and raised in Cleveland, Ohio, Aaron has had a number of careers and passions throughout his life.  Aaron has been a musician for over twenty years and was previously the bass player for the rock band The Rosenbergs, and then later, the frontman of the band Stealing Heather.  Though he is now retired from professional music, throughout his music career, Aaron was staunchly committed to speaking out in support of artists' rights and social justice causes.

56.     Aaron is also a self-taught computer programmer who has been coding since he was in the fourth grade.  When he was thirteen years old, he coded his first application, and in 1999, he built a low-cost computer and founded his first technology company.  In 2001, Aaron also worked as one of the first Mac Geniuses when Apple launched its Apple Stores.

57.     Since August 2020, Aaron has been developing a healthcare application called "ALL U Chart" which is designed to function as an "all-in-one" tracker and visualizer for

symptoms, test results, medications, and more, in order to help patients streamline a healthcare process that can often be impersonal, disjointed, and stressful, and to improve patients' ability to track correlations between various symptoms and medications.

58.     Although ALL U Chart is still in development, in 2022, Aaron registered an S corporation for the business and registered as an Apple Developer through Apple's Developer Program in preparation for the public launch of ALL U Chart through Apple's App Store.  Joining the paid Apple Developer Program provides programmers access to Apple's development tools, documentation, and software needed to build and test apps, and also, with the ability to publish apps on the App Store, use advanced features like iCloud and push notifications, test on real devices, and manage app distribution.

59.     In the wake of the 2024 election, Aaron sought to find a way to use his knowledge of computer programming and app development to help the community.  Because the rhetoric surrounding the election had focused so prominently on Trump's plans to mobilize every resource in the federal arsenal to effectuate his promise of mass deportation, Aaron decided to develop an application that could help those in the communities and localities who would be most affected avoid potential harm.

60.     In early January 2025, Aaron began coding the application that would eventually become ICEBlock.  Inspired by Waze, Google Maps, Apple Maps, and other applications with community-sourced police "speed trap" reporting capabilities, Aaron sought to develop an application that would alert people to nearby, community-reported sightings of ICE.

61.     At a high level, ICEBlock allows people to report potential ICE activity through a simple map interface, displaying sightings within a five-mile radius.  Reports automatically expire after a few hours to prevent outdated information, and no personal data or account registration is

required.  The details of ICEBlock's key features are central to understanding its intended

functionality and the intent behind the app.

### A.  ICEBlock is Designed to Prioritize Simplicity

62.    ICEBlock is an extraordinarily simple application.  When a user opens ICEBlock,

this is what they see:



63.    To report a sighting, a user of ICEBlock can either "tap" on a location on the map

or manually enter an address by clicking the "+" button on the top right of the screen.  These

sightings consist solely and entirely of only two pieces of information: (1) an address; and (2) an

optional "notes" field, with a 400-character limit.  When a user reports a sighting, after either

tapping on the map or tapping the "+" button, this is what they see:



64.     ICEBlock users cannot send, receive, or otherwise upload to ICEBlock any photographs, videos, hyperlinks, or other media of any kind.  Furthermore, and unlike traditional social media applications, users cannot create a "profile," and they cannot "chat" with one another; indeed, there is never (and can never be) any direct communication between any ICEBlock users.

65.     ICEBlock's simple design was a purposeful choice and is key to its functionality. In designing ICEBlock, Aaron sought to ensure that people of all ages, who speak any language, and who may have varying degrees of familiarity with technology could use it.  The simplicity and ease with which users can report a sighting on ICEBlock was also born of a concern for user safety. In particular, many users may not feel comfortable visibly lifting their phones around law enforcement personnel (*i.e.*, to take photographs or make video recordings), and thus the ability to report a public sighting of ICE by simply "tapping on a map" was a feature that was intentionally

designed to keep people as comfortable and safe as possible in potentially charged situations.

### B. Aaron Sought to Maximize ICEBlock User Anonymity and Privacy

66.    From the very inception of ICEBlock, Aaron knew that ensuring that users' identity, personal information, and data remained as anonymous as possible would be critical to the application's utility.  ICEBlock's website states, "[a]t ICEBlock, user privacy and security are paramount.  Our application is designed to provide as much anonymity as possible without storing any user data or creating accounts."  ICEBlock does not collect and store information that could be used to identify any user.

67.    ICEBlock does not have user accounts and thus does not require usernames or passwords.  It also does not use or ask for users' phone numbers, emails, addresses, or any other information that could be used to determine the identity of any user.  Furthermore, it is entirely free, does not earn any money whatsoever for Aaron (or otherwise), and no data input into or otherwise associated with ICEBlock is ever bought or sold.

68.    In addition to these features of the application itself, Aaron sought to ensure that the platform on which ICEBlock was hosted also facilitated user privacy.  In particular, ICEBlock was only ever available on the Apple App Store and was only available for download for those with an iPhone and the Apple software iOS 18.2 or greater, which provides the ability to deliver push notifications without requiring ICEBlock to store user-identifiable information.  Aaron chose to limit ICEBlock's availability exclusively to Apple devices for the purpose of limiting user data—such as device identifiers, IP addresses, or activity logs—from being collected or retained by ICEBlock.

### C. ICEBlock Includes Features to Mitigate Spam and the Spread of Misinformation

69.    In order to ensure that ICEBlock functions as a reliable tool for promoting

community awareness and safety, the App incorporates a range of features specifically designed to prevent the dissemination of spam and false or misleading information.

70.    **Five-Mile Radius**.  ICEBlock limits notifications about an ICE sighting to users within a five-mile radius of the reported sighting.  This helps keep notifications relevant—only those who are actually nearby receive alerts—while preventing unnecessary exposure of information to people outside the affected area.  The same is true for reporting ICE sightings: a user can only report a sighting that is associated with an address within five miles of their current location, which prevents people from submitting false reports from distant areas.

71.    **Real Addresses**.  To maintain the integrity of reports, all reported sightings on ICEBlock must be tied to a verified, real-world address.  When a user reports a sighting by "tapping" on the map, ICEBlock automatically uses reverse geocoding to confirm and display the actual street address (for example, "123 Main Street").  If a user enters a location manually, only the verified address is shown.  This process ensures that users cannot spam the system with fake or inaccurate locations.

72.    **No Duplicate Sightings**.  Each sighting of ICE can only be reported once. ICEBlock automatically checks for duplicate reports based on location to prevent the same sighting from being submitted multiple times.  This restriction helps maintain the accuracy of the reported sightings and prevents false inflation of reports—ensuring that one sighting is not mistakenly counted as several.  By limiting duplicate submissions, the system also reduces noise, improves reliability, and helps users trust that every sighting in the database represents a unique event.

73.    **Five-Minute Reporting Limit**.  After submitting a reported sighting, ICEBlock users must wait five minutes before they can report another one.  If a user attempts to submit a new report within five minutes, ICEBlock displays a "countdown timer" showing how much time

remains before the user can submit again.  This short delay helps prevent spam and false reporting by discouraging rapid, repeated submissions.  It also reduces the likelihood of accidental duplicates and limits the impact of anyone attempting to flood the system with false or exaggerated information.

74.    **Four-Hour Data Expiration**.    On ICEBlock, all reported sightings are automatically removed from the map after four hours.  This time limit reflects the reality that it is unlikely ICE would still be present at a location beyond that window.  Once a sighting is deleted after this four-hour period, all associated data and records are permanently removed from ICEBlock's system and cannot be recovered.  ICEBlock cannot be used to track ICE agents' historical presence or movements.

### D.  ICEBlock Was Explicitly Developed "For Informational Purposes Only"

75.    Each and every time an ICEBlock user opens the application, and before they report a sighting, they are greeted with the following disclaimer on the bottom of their screen:



76.    The disclaimer reads in full:

> Please note that the use of this app is for information and notification purposes only.  It is not to be used for the purposes of inciting

violence or interfering with law enforcement.

77.    This disclaimer has been on the homepage of ICEBlock since its very first published iteration; thus, no user of ICEBlock has ever encountered a version of the App that does not include this notice.  This disclaimer makes clear that the App was never intended for any violent or unlawful purpose.  Its sole function is to provide information and alerts so that communities can stay informed and make safe, lawful decisions.

78.    Fundamentally, ICEBlock neither enables nor encourages confrontation—it simply delivers time-limited location information to help users stay aware of their surroundings in a responsible and nonviolent way.  Not only is it designed that way—with functionality that ensures it can only be used for informational purposes—but it also includes this express prohibition against any other use.

### E.  ICEBlock Is Powered by Communities

79.    ICEBlock is entirely community driven.  All of its content comes exclusively from user-submitted reports of ICE sightings, without any verification, moderation, or intervention from Aaron or any third parties.  No algorithms were ever created or used to predict or generate sightings, and no external information sources, such as news feeds or official data, were ever integrated into the platform.

80.    ICEBlock users are the sole source of all reported sightings and all sightings occur in public: as a result, the App's functionality and content depend entirely on what members of the community are seeing with their own eyes.

### IV.    Apple Thoroughly Reviewed ICEBlock Before Making It Available for Download on the App Store

81.    Apple's app development review team and attorneys reviewed ICEBlock for compliance with the company's terms of service and lawful uses over approximately five weeks.

After this thorough vetting process, the company determined that ICEBlock was safe, lawful, and compliant, and approved it for distribution through the App Store in April 2025.

82.     Prior to distribution through the App Store, all apps must be submitted to Apple through what are called the "Developer Portal" and "App Store Connect."  These platforms act as the main workspace where Apple reviews the app and provides feedback.  When a developer submits an app for review, Apple's review team may send messages through the Resolution Center—a built-in messaging area where developers can read Apple's comments, ask questions, and reply directly.  This is where issues like missing information, policy clarifications, or design changes are discussed before approval.

83.     Developers also see important notices in the Developer Portal itself, such as requests to update agreements or fix technical details before continuing.  In short, all key back-and-forth communication about an app's readiness for launch happens within Apple's own developer system.

84.     It is common for Apple to reject an app during the App Store review process before launch, often because the reviewers find bugs, crashes, or incomplete features that need to be fixed. If the app crashes, has broken functionality, or does not comply with the App Store guidelines, Apple will reject it and provide feedback so the developer can make corrections and resubmit.

85.     In February 2025, Aaron finished coding the first iteration of ICEBlock.  Shortly thereafter, Aaron submitted ICEBlock to Apple through Apple's Developer Portal for review prior to publication on the App Store.  Because Aaron had already registered as an Apple Developer through Apple's Developer Program in connection with his development of ALL U Chart, Aaron submitted ICEBlock to Apple using his account associated with ALL U Chart.

86.     After submitting ICEBlock for review, Aaron received a message in the Developer

Portal notifying him that Apple had initially rejected ICEBlock for publication.  Shortly thereafter, an employee from Apple's "review team" reached out to Aaron to clarify their understanding of ICEBlock, its functionality, and its purpose.

87.    During the Spring of 2025, Aaron and various Apple employees corresponded regarding ICEBlock.  These communications included messages sent via the Developer Portal and several WebEx video calls.   Multiple conversations included members of Apple's legal department.

88.    In these conversations, Apple inquired into various issues concerning ICEBlock's functionality, its purpose, and other technological specifics.  Aaron explained that ICEBlock functioned similarly to the feature of peer-reported speed traps in Apple Maps and Waze.

89.    In both Waze and Apple Maps, users can report the presence of speed traps or police activity by selecting the appropriate in-app option, which then notifies nearby drivers of the report.  These alerts typically appear as icons or brief on-screen messages indicating the location and nature of the enforcement activity.  The functionality is entirely crowd-sourced, relying on real-time user input and community confirmation to maintain accuracy and relevance.  As more users report or verify the same event, the platforms increase the confidence level of the alert and display it more prominently to other drivers in the vicinity.  An example of this reporting feature in Apple Maps is included below:



90.     During these conversations, Apple also asked whether Aaron intended to monetize ICEBlock.  Aaron confirmed that he had no such intention, and on the contrary, that he intended to make the App entirely free for download and use.  For Aaron, making ICEBlock freely available to anyone who might need it was the very purpose of creating the App.

91.     By late March 2025, after performing its thorough review and vetting process, Apple confirmed that ICEBlock was suitable for hosting and publication on its App Store.  On April 2, 2025, ICEBlock was officially launched on the Apple App Store for public download.  In its first month on the App Store, ICEBlock was downloaded fewer than 5,000 times.

## V.    Amid Trump's Immigration Crackdown, CNN Features ICEBlock, Spurring Hundreds of Thousands of Users to Download It from Apple's App Store

92.     In early June 2025, federal immigration raids swept through Los Angeles in what became the first major urban enforcement operation of Trump's second term.  Beginning on June 6, agents from ICE and DHS conducted coordinated raids across several worksites in the city, including factories in the downtown garment district and a major home-improvement retailer in the San Fernando Valley.  According to reports, dozens of individuals were detained in administrative immigration arrests over just the first two days.  Between June 7 and 10, 2025,

National Guard units were deployed, according to the Administration, in order to protect federal facilities and support DHS operations.

93.     On June 30, 2025, amidst Trump's controversial and expansive immigration enforcement crackdown and in the wake of these highly publicized ICE raids in Los Angeles, CNN News Central aired a segment prominently featuring ICEBlock as part of a discussion of the contrast between those tech companies that have supported President Trump's policies and those, like Aaron's, which have resisted Trump's policies.

94.     Clare Duffy, the lead CNN reporter on the story, interviewed Aaron and summarized her conversation with him on air.  She reported: "[Aaron] said he wanted to create an early warning system to let people know where ICE officers had been sighted.  So this app, you open it up and you see a map.  Users can tap on the map to, you know, alert other users of ICE sightings, other users within a five-mile radius of that sighting will get a push alert, letting them know."



95.     Duffy emphasized that when she interviewed Aaron, he made clear that his intent in developing ICEBlock was for "***people [to] us[e it] as a way to know where ICE is located, but not to interfere with officers' activity***."

26

96.    The public reaction was immediate.  Prior to the CNN feature on June 30, 2025, ICEBlock had approximately 20,000 users.  Within less than a week of CNN's story, ICEBlock became the #1 most-downloaded "Social Networking" application on Apple's App Store and gained over 500,000 user downloads.  By July 1, 2025, ICEBlock became the third most-downloaded application in the entire App Store.

## VI.    Senior Trump Administration Officials Retaliate Against Plaintiffs by Baselessly Threatening Criminal Prosecution

97.    The retaliation from Defendants was also immediate.  Within hours of CNN's feature of ICEBlock, each of the Defendants falsely claimed that Plaintiffs were engaged in criminal conduct and were inviting violence against law enforcement officers.  Defendants falsely stated the Plaintiffs' protected speech was illegal and threatened to investigate and prosecute Aaron—as well as CNN—because they disagreed with the App's content.

98.    The same day the CNN feature aired, Defendant Lyons stated that ICEBlock was "sickening," and falsely claimed that CNN's promotion of the App constituted "inviting violence against [ICE agents] with a national megaphone."  The same day, Lyons also took aim at CNN for covering the App and suggested that DOJ would look into the matter "to see exactly what we can do" to stop CNN from "promoting" the App.

99.    Defendant Homan echoed Lyons's sentiments that same evening on a popular podcast hosted by political commentator Benny Johnson, calling CNN's decision to cover the App "disgusting" and calling for DOJ to investigate whether CNN crossed a line in covering the App.  By calling for DOJ to investigate CNN's coverage of ICEBlock, Homan falsely implied that Plaintiffs' protected speech was illegally endangering law enforcement officers.



100.    In response to a question from Johnson about whether ICEBlock and CNN were

engaged in criminal wrongdoing, Homan stated:

> . . . . ***DOJ is looking at it***.  DOJ, you know, we had over, we had, I
> think the last count over 600 arrests in LA.  The federal government
> has prosecuted people for assaulting ICE agents.  We prosecuted
> people for doxing agents.  ***So, DOJ is on top of this***.  ***So, I think***
> ***DOJ will come to the point where these people will be held***
> ***accountable. . . . I know Pam Bondi is all over it***.

101.    The same day, Defendant Bondi appeared on Fox News for an interview with Sean

Hannity.   In that segment, Hannity replayed portions of CNN's reporting on ICEBlock and,

referencing Aaron, asked Bondi, "If you have, or put out an application, or a warning system, that

ICE agents are in the area, are you guilty of obstruction? Are you guilty of aiding and abetting in

that case?"  Bondi responded, in pertinent part:

> He's giving a message to criminals where our federal officers are.
> And he cannot do that.  ***And we are looking at it, we are looking at***

*him, and he better watch out, because that's not protected speech.*
That is threatening the lives of our law enforcement officers
throughout this country.

102.    Bondi then contrasted CNN's reporting on ICEBlock, which she claimed was

promoting the App, with that of Fox News, which she said was properly warning people about the

App.  She stated, regarding law enforcement officers:

> They're out there protecting all of us. They're protecting CNN.
> They're protecting everyone. Yet these people are so against law
> enforcement officers whether you are a candidate for mayor in New
> York City or you're some network promoting an app.  ***You're***
> ***warning people about that app and not to use it, and thank you for***
> ***that.***

103.    Bondi's statements make clear that her threats of adverse action constitute

viewpoint discrimination, where speech "promoting" the app is unlawful but speech "warning"

about the app is lawful.

104.    That same evening, Defendant Noem posted on X that ICEBlock "***sure looks like***

***obstruction of justice***."  Her post read in full:



105.    The next day, July 1, 2025, Noem told reporters that DHS was "working with the Department of Justice to see if we can prosecute [CNN] for [the ICEBlock story], because what they're doing is actively encouraging people to avoid law enforcement activities, operations and ***we're going to actually go after them and prosecute them with the partnership of Pam [Bondi]***," adding, "***what they're doing, we believe, is illegal***."

106.    White House Press Secretary Karoline Leavitt and others have falsely claimed that ICEBlock and similar apps are responsible for violent attacks on law enforcement officers, such as the tragic shooting of immigrants at an ICE detention facility in Dallas, Texas, on September 24, 2025.  No actual evidence has ever been cited to support these claims.

**VII.    Apple Removes ICEBlock from the App Store and Bondi Claims Credit**

107.    By early October 2025, ICEBlock had grown to over 1.14 million users.

108.    On October 2, 2025, Apple removed ICEBlock and a number of other ICE tracking apps from the App Store, preventing any new downloads of the App.  Apple issued the following public statement:

> We created the App Store to be a safe and trusted place to discover apps.  ***Based on information we've received from law enforcement about the safety risks associated with ICEBlock, we have removed it and similar apps from the App Store***.

109.    Aaron first learned ICEBlock had been removed from an administrative message he received from Apple via the Developer Portal that same day.  That message makes clear that Apple rescinded its approval of ICEBlock because of Defendant Bondi and DOJ officials.   On October 2, 2025, Apple wrote to Aaron:

> Hello,
>
> We are writing to let you know about new information regarding the latest approved version of your app, which could impact its availability on the App Store.

Upon re-evaluation, we found that your app is not in compliance with the App Review Guidelines. Specifically, we found your app is in violation of the following:

1.1 Objectionable Content
Apps should not include content that is offensive, insensitive, upsetting, intended to disgust, in exceptionally poor taste, or just plain creepy. Examples of such content include:

1.1.1 Defamatory, discriminatory, or mean-spirited content, including references or commentary about religion, race, sexual orientation, gender, national/ethnic origin, or other targeted groups, particularly if the app is likely to humiliate, intimidate, or harm a targeted individual or group. Professional political satirists and humorists are generally exempt from this requirement.

***Information provided to Apple by law enforcement shows that your app violates Guideline 1.1.1 because its purpose is to provide location information about law enforcement officers that can be used to harm such officers individually or as a group. For this reason, your app will be removed from the App Store*** [emphasis added]. Customers who have previously downloaded this app will continue to have access to it on their devices, but they will be unable to re-download this app from the App Store or restore this app from a backup if they delete it from their device. Additionally, customers will be unable to purchase in-app purchase products and any auto-renewable subscriptions will be cancelled.
The TestFlight version of this app will also be unavailable for external and internal testing and all public TestFlight links will no longer be functional.

Best regards,
App Review

110.    Aaron immediately responded to Apple, requesting that it reverse its decision. His message reminded the reviewers that the company had conducted a searching inquiry and determined that ICEBlock was lawful and compliant with App Store guidelines and terms of service when approving the App. He wrote:

There is no objectionable content in the app. Prior to being approved the app was thoroughly vetted by Apple legal and senior officials in App Review. There have been no changes to the

content provided or features in the app.  Please immediately rescind this removal and put it back on the App Store.  If there are specific questions you need answered, please reach out to me directly via phone at [*Aaron's personal phone number*].

111.    On October 3, 2025, Apple replied to Aaron, again confirming that it removed ICEBlock because of communication with the government.  Apple wrote:

As we previously communicated, ***information provided to Apple by law enforcement shows that your ICEBlock App violates Guideline 1.1.1 because its purpose is to provide location information about law enforcement officers*** that can be used to harm such officers individually or as a group [emphasis added].

112.    Apple did not provide Aaron with the substance of "information provided to Apple by law enforcement," nor indicate which law enforcement agency had communicated the information.

113.    Bondi, however, gave a statement to the press claiming responsibility for having the ICEBlock App taken down by Apple.  On October 2, 2025, she stated on Fox News: "***We reached out to Apple today demanding they remove the ICEBlock app from their App Store — and Apple did so***."

114.     Bondi later confirmed the content of this statement in sworn testimony.  She testified before the Senate Judiciary Committee on October 7, 2025, that DOJ had spoken with Apple to get the ICEBlock App taken down: "***We fought- well we spoke with Apple and Google to get the ICEBlock app taken down***."  She then added, falsely, that ICEBlock "was reckless ***and criminal*** in that people were posting where ICE officers lived."  She subsequently walked back that statement, clarifying that the App informed users only where ICE officers worked.

115.    Senator Mike Lee responded to Bondi's testimony by emphasizing how much work DOJ had to do in order to get Apple to remove ICEBlock from the App Store: "It's stunning, I would add here, that it took as much work as it did by you to get them to take that down. . . .  I'm

glad that they have taken this 'Block ICE' app down, but it's a shame it took as long as it did **and as much work on your part** to get them to take it down."   Bondi confirmed Senator Lee's statements.

116.    On October 8, 2025, Bondi again stated, this time during a public speech, "**We had Apple and Google take down the ICEBlock apps. Hope they continue to comply with that**." Although ICEBlock was developed for iPhones and was never available on the Google Play Store, following Bondi's statements both Apple and Google also removed several other apps that allowed users to post information about immigration agents' public operations.

117.    Based on these publicly reported facts, and on information and belief, Apple removed ICEBlock from the App Store in response to direct coercion from Defendant Bondi, her subordinates in the DOJ, and others in the Trump Administration acting at the Defendants' direction.

118.    Based on annual reports published by Apple, Apple's removal of ICEBlock and the other ICE tracking apps appears to be the first known instance of Apple removing U.S.-based apps in response to U.S. government demands.  By contrast, Apple removed more than 1,700 apps from its App Store in 2024 in response to foreign government requests, according to Apple's 2024 App Store Transparency Report.

119.    Defendants have not made comparable demands—and Apple has not removed similar applications, including Citizen, Police Scanner, Waze, Google Maps, or Apple Maps—that crowdsource or track the location of police officers engaged in non-immigration-related enforcement activities.

## FIRST CLAIM FOR RELIEF
**Violation of the First Amendment: Coercion of a Private Entity to Censor Protected Speech**
**(Against All Defendants)**

120.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

121.    The First Amendment to the United States Constitution prohibits federal officials from abridging freedom of speech, discriminating based on viewpoint, or coercing private entities to suppress disfavored expression.

122.    Software programs like ICEBlock are a form of speech protected by the First Amendment.  The First Amendment similarly protects Aaron's right to create, distribute, and promote ICEBlock.

123.    At all relevant times, Defendants were senior officials and agency heads of the United States government, acting under color of federal authority and within the scope of their official duties.

124.    Defendant Bondi's demand to Apple to remove ICEBlock from the App store, as well as her viewpoint-based criticism of CNN for publicizing the app, constitute a "scheme of state censorship" designed to "suppress" Plaintiffs' publication and distribution of the App.  *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963).  Defendant Bondi has the power to coerce Apple and CNN by investigating, regulating, prosecuting, and otherwise interfering with their business functions.

125.    Defendants Noem, Lyons, and Homan threatened Aaron and CNN, falsely claiming that each was acting illegally.  These statements are reasonably understood to convey a threat of adverse government action against any entity making the App available.  They constitute excessive pressure on Apple to remove the App and others like it from the App Store.  These threats also suppress Aaron's speech, chill, deter, and suppress the distribution of ICEBlock, and curtail the

speech and expressive conduct of ICEBlock users.

126.    Through such communications, Defendants used the weight and authority of their federal offices successfully to pressure, threaten, or otherwise coerce Apple to take adverse action against Plaintiffs' speech.

127.    Defendants' unlawful conduct constitutes an unconstitutional prior restraint because they are designed to prevent Aaron from developing, distributing, and promoting ICEBlock.

128.    Defendants' unlawful conduct constituted coercion or significant encouragement of a private party to engage in viewpoint-based suppression, thereby rendering Apple's removal of the App state action for purposes of the First Amendment.

129.    As a direct and proximate result of Defendants' unconstitutional actions, Plaintiffs suffered and continue to suffer irreparable injury, including loss of distribution channels, reputational harm, diminished audience reach, and ongoing chilling of protected expression.

130.    Defendants' conduct has caused and continues to cause Plaintiffs to suffer violation of their rights under the First Amendment.

131.    Plaintiffs have no plain, adequate, or speedy remedy at law.

132.    Plaintiffs are entitled to declaratory and injunctive relief prohibiting Defendants from coercing, threatening, or pressuring private parties to suppress Plaintiffs' or others' lawful expression, and to such further relief as the Court deems just and proper.

**SECOND CLAIM FOR RELIEF**
**Violation of the First Amendment: Threatened Prosecution for Protected Speech**
**(Against All Defendants)**

133.    Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

134.    The First Amendment to the United States Constitution prohibits federal officials from retaliating against individuals for engaging in protected speech or from using threats of

criminal prosecution to suppress disfavored expression.

135.    Software programs like ICEBlock are a form of speech protected by the First Amendment.  The First Amendment similarly protects Aaron's right to create, distribute, and promote ICEBlock.

136.    At all relevant times, Defendants were senior officials and agency heads of the United States government, acting under color of federal authority and within the scope of their official duties.

137.    Defendants violated Aaron's First Amendment rights by threatening Aaron, an individual citizen, with criminal prosecution based on his lawful development, distribution, and promotion of the App.

138.    Defendant Bondi has the power to carry out those threats through law enforcement investigation or action against Aaron.  Defendants Noem, Lyons, and Homan are high-level government officials who have the power to investigate and strongly persuade prosecution by the DOJ and other law enforcement agencies.

139.    Defendants' threats were intended to deter Aaron from engaging in further protected speech and to chill a person of ordinary firmness from continuing to speak or express similar viewpoints.

140.    Defendants' threats constitute retaliation and coercion in violation of the First Amendment because the government may not use threats of punitive action to burden or chill protected expression.

141.    Aaron is suffering and will continue to suffer irreparable harm as a result of Defendants' unconstitutional actions, including the ongoing chilling of his protected speech.

142.    Aaron has no plain, adequate, or speedy remedy at law.

143.    Aaron seeks declaratory and injunctive relief prohibiting Defendants, and those acting in concert with them, from threatening or initiating criminal prosecution in retaliation for, or to suppress Aaron's constitutionally protected speech, and for such further relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

144.    Declare that Defendants' actions coercing, threatening, or demanding that Apple stop distributing the App via the App Store violate Plaintiffs' rights under the First Amendment to the United States Constitution;

145.    Declare that Defendants' threats to criminally investigate and/or prosecute Aaron for his role in developing, distributing, and promoting the App violates Aaron's rights under the First Amendment to the United States Constitution;

146.    Permanently enjoin Defendants—including their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from coercing, threatening, or demanding Apple or other app distribution services in order to stop distribution of the App; and

147.    Permanently enjoin Defendants—including their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction—from threatening, investigating, or prosecuting Aaron.

148.    Award Plaintiffs costs, attorney's fees, and other disbursements for this action; and

149.    Grant any and all other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 8, 2025

Respectfully submitted,

/s/  *Noam Biale*

Deirdre D. von Dornum*
Noam Biale
Kathryn E. Ghotbi*
Alexandra Conlon[†]
**SHER TREMONTE LLP**
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
nbiale@shertremonte.com
dvondornum@shertremonte.com
kghotbi@shertremonte.com
aconlon@shertremonte.com

*Attorneys for Plaintiffs*

*\*Application for admission pending*
[†] *Application for admission forthcoming*