**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOSHUA AARON and ALL U CHART, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> TODD BLANCHE, et al., <br><br> *Defendants.* | Civil Action No. 1:25-CV-04250-DLF |

<u>**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**</u>

**ELECTRONIC FRONTIER
FOUNDATION**

David E. Greene (pro hac vice)
F. Mario Trujillo, DC Bar No. 1672880
Aaron Mackey, DC Bar No. 1017004

815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
davidg@eff.org
mario@eff.org
amackey@eff.org

**SHER TREMONTE LLP**

Noam Biale, DC Bar No. NY0459
Deirdre von Dornum, DC Bar No. NY0696
Justin J. Gunnell†
Alexandra Conlon†

90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
nbiale@shertremonte.com
dvondornum@shertremonte.com
jgunnell@shertremonte.com
aconlon@shertremonte.com

*† Application for Admission Pro Hac Vice
forthcoming*

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................ 4

    A.   Aaron Develops the ICEBlock Application ..................................................................... 4

    B.   Apple's Thorough Review and Approval of ICEBlock ................................................... 5

    C.   CNN Features ICEBlock Spurring Substantial Usership and Downloads ....................... 5

    D.   The Coordinated Government Campaign to Squash ICEBlock and Punish Aaron ........ 6

    E.   More Than Three Months Later, Apple Removes ICEBlock at the
        Government's Demand ..................................................................................................... 7

    F.   The Concrete Impact on Plaintiffs .................................................................................. 8

LEGAL STANDARDS ................................................................................................................. 9

ARGUMENT ................................................................................................................................ 9

    I.    PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT BOTH CLAIMS ............ 9

        A.   Plaintiffs Have Standing to Bring Their Coercion Claims ............................................. 9

            i.    Plaintiffs have sufficiently alleged traceability: that Apple removed
                ICEBlock from the App Store because the Attorney General coerced it to
                do so ..................................................................................................................... 10

            ii.   Plaintiffs' injuries are redressable by the requested injunctive relief because
                they have sufficiently alleged continued, ongoing injury and a substantial
                threat of future harm ........................................................................................... 16

           iii.   Alternatively, the Court should grant targeted jurisdictional discovery into
                Defendants' non-public communications with Apple ......................................... 20

        B.   Plaintiffs Have Standing for Prospective Relief on the Retaliation Claim ................... 21

            i.    Plaintiffs have suffered an injury-in-fact: Each of the Defendants made
                threats forcing Plaintiffs into a Hobson's choice between speech and
                prosecution ........................................................................................................... 22

            ii.   Plaintiffs' injuries are directly traceable to the Defendants' conduct ................... 25

iii.    Defendants' own actions — including enforcement against similarly situated speakers and the successful suppression of ICEBlock — confirm the credibility of their threats ................................................................. 25

iv.    An injunction would redress Plaintiffs' injuries ....................................... 27

II.    PLAINTIFFS STATE A VIABLE FIRST AMENDMENT COERCION CLAIM ......... 28

A.    The Attorney General and Doe Defendants Have Direct Civil and Criminal Authority to Investigate and Prosecute Apple .............................................. 29

B.    Defendants' "Demand" to Apple Constitutes a Threat to Investigate and Criminally Prosecute Apple if It Did Not "Comply" ...................................... 30

C.    Defendants' Demand Should Be Understood in the Context of Similar Prosecution Threats ...................................................................................... 32

D.    Apple's Unprecedented and Immediate Reaction Shows Defendants' Conduct Was Understood as a Threat ......................................................................... 33

III.    PLAINTIFFS STATE A VIABLE FIRST AMENDMENT RETALIATION CLAIM .................................................................................................................. 35

A.    Plaintiffs Engaged in Protected Speech .......................................................... 35

B.    Defendants Took Adverse Action Sufficient to Deter a Person of Ordinary Firmness ....................................................................................................... 36

C.    Plaintiffs Have Plausibly Alleged a Causal Link Between Their Protected Speech and Defendants' Adverse Action ....................................................... 38

D.    Defendants' Characterization of Their Statements as "Government Speech" Is Unavailing ................................................................................................ 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anatol Zuckerman and Charles Krause Reporting, LLC v. U.S. Postal Serv.*,
 64 F.4th 1354 (D.C. Cir. 2023) ........................................................................................ 16

*Aref v. Lynch*,
 833 F.3d 242 (D.C. Cir. 2016) ...................................................................................... 3, 35

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ....................................................................................................... 9, 11

*Backpage.com, LLC v. Dart*,
 807 F.3d 229 (7th Cir. 2015) ..................................................................................... passim

*Banks v. York*,
 515 F. Supp. 2d 89 (D.D.C. 2007) ...................................................................................... 38

*Bantam Books, Inc. v. Sullivan*,
 372 U.S. 58 (1963) ...................................................................................................... passim

*Beedle v. Wilson,*
 422 F.3d 1059 (10th Cir. 2005) ......................................................................................... 40

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ...................................................................................................... 9, 11

*Block v. Meese*,
 793 F.2d 1303 (D.C. Cir. 1986) ......................................................................................... 39

*Brodheim v. Cry*,
 584 F.3d 1262 (9th Cir. 2009) ........................................................................................... 37

*Brown v. Entertainment Merchants Ass'n*,
 564 U.S. 786 (2011) ........................................................................................................... 35

*Center for Democracy & Technology v. Pappert*,
 337 F. Supp. 2d 606 (E.D. Pa. 2004) ................................................................................. 29

*Changizi v. Department of Health & Human Services*,
 82 F.4th 492 (6th Cir. 2023) .............................................................................................. 14

*Clapper v. Amnesty International USA*,
 568 U.S. 398 (2013) ...................................................................................................... 23, 24

iii

*Council for Periodical Distribs. Ass'n v. Evans*,
  642 F. Supp. 552 (M.D. Ala. 1986) ................................................................. 18

*Doe v. District of Columbia*,
  796 F.3d 96 (D.C. Cir. 2015) ......................................................................... 39

*Escobar Molina v. DHS*,
  811 F.Supp.3d 1 (D.D.C. 2025) ................................................................. 16, 17

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ..................................................................................... 27

*Green v. U.S. Dep't of Justice*,
  392 F. Supp. 3d 68 (D.D.C. 2019) .................................................................. 24

*Harrison v. Fed. Bureau of Prisons*,
  298 F. Supp. 3d 174 (D.D.C. 2018) ............................................................... 38

*Hart v. Facebook*,
  No. 23-15858, 2024 WL 1693355 (9th Cir. April 19, 2024) ............................ 14

*Ho v. Garland*,
  106 F.4th 47 (D.C. Cir. 2024) ................................................................... 15, 16

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ......................................................................................... 26

*Jibril v. Mayorkas*,
  20 F.4th 804 (D.C. Cir. 2021) ................................................................... 16, 17

*Klamath Water Users Ass'n v. FERC,*
  534 F.3d 735 (D.C. Cir. 2008) ...................................................................... 17

*Laird v. Tatum*,
  408 U.S. 1 (1972) .................................................................................. 2, 21, 23

*Lewis v. Mutond*,
  62 F.4th 587 (D.C. Cir. 2023) ....................................................................... 20

*Lujan v Defenders of Wildlife*,
  504 U.S. (1992) .............................................................................................. 9

*Media Matters for Am. v. Paxton*,
  138 F.4th 563 (D.C. Cir. 2025) ................................................................. 36, 37

iv

*Meese v. Keene*,
  481 U.S. 465 (1987)...................................................................................... 2, 22, 24, 25

*Moody v. NetChoice*,
  603 U.S. 707 (2024)...................................................................................................... 29

*Murthy v. Missouri*,
  603 U.S. 43 (2024)............................................................................................... passim

*N.Y. Republican State Comm. v. SEC*,
  799 F.3d 1126 (D.C. Cir. 2015)................................................................................... 24

*Nat. Res. Def. Council v. Pena*,
  147 F.3d 1012 (D.C. Cir. 1998).................................................................................... 20

*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024).............................................................................................. passim

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978)...................................................................................................... 20

*Ortega-Melendres v. Arpaio*,
  836 F. Supp. 2d 959 (D. Ariz. 2011) .......................................................................... 16

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)................................................................................................. 16, 22

*Parsons v. Dep't of Justice*,
  801 F.3d 701 (6th Cir. 2015) ...................................................................................... 17

*Penthouse International, Ltd. v. Meese*,
  939 F.2d 1011 (D.C. Cir. 1991).............................................................................. 39, 40

*Poe v. Ullman*,
  367 U.S. 497 (1961)...................................................................................................... 26

*Price v. Garland*,
  45 F.4th 1059 (D.C. Cir. 2022)................................................................................ 29, 36

*Richman v. United States*,
  350 F.R.D. 401 (D.D.C. 2025)...................................................................................... 17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)...................................................................................................... 39

*Sandvig v. Sessions*,
    315 F. Supp. 3d 1 (D.D.C. 2018)................................................................ 24

*Sprint Communications Co. v. APCC Services, Inc.*,
    554 U.S. 269 (2008).................................................................................. 27

*Steffel v. Thompson*,
    415 U.S. 452 (1974).................................................................................. 26

*Tachias v. Sanders*,
    130 F.4th 836 (10th Cir. 2025) ................................................................ 40

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016).................................................................. 24

*United States v. Smith*,
    950 F.3d 893 (D.C. Cir. 2020).................................................................. 31

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977).................................................................................. 17

*VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*,
    992 F.3d 1097 (D.C. Cir. 2021) ................................................................ 15

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) .................................................................. 35

*Winter v. Natural Resources Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................ 9

*Woodhull Freedom Found. v. United States*,
    948 F.3d 363 (D.C. Cir. 2020)............................................................ 17, 26

**Statutes**

Judiciary Act of 1789, 1 Stat. 93................................................................. 29

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ...................................................... 9

Federal Rule of Civil Procedure 12(b)(6) ...................................................... 9

Federal Rule of Civil Procedure 25(d)........................................................... 1

Federal Rule of Evidence 201(b) ................................................................. 19

**Other Authorities**

Black's Law Dictionary (12th ed. 2024)....................................................................................... 30

U.S. Department of Justice, *Justice Department Sues Apple for Monopolizing Smartphone Market* (March 21, 2024), https://www.justice.gov/archives/opa/pr/justice-department-sues-apple-monopolizing-smartphone-markets. ......................................................................... 30

**PRELIMINARY STATEMENT**

Then-Attorney General Pamela J. Bondi of the United States publicly boasted — and confirmed under oath before the United States Senate — that she "demand[ed]" Apple remove Plaintiffs' application from the App Store, "and Apple did so." Amend. Compl. ¶ 115. She also warned Plaintiff Joshua Aaron on national television: "we are looking at him, and he better watch out, because that's not protected speech." *Id.* ¶ 101. Then-DHS Secretary Kristi L. A. Noem stated that the app was engaged in "obstruction of justice." *Id.* ¶ 104. Acting ICE Director Todd Lyons announced he was coordinating with the Department of Justice to prosecute. *Id.* ¶ 98. And White House Border Czar Tom Homan called for a federal investigation. *Id.* ¶ 99. Defendants[1] now ask this Court to hold that their own admissions establish neither standing nor a claim. They are wrong on both counts.

Defendants argue that Plaintiffs lack standing for their coercion claim because Apple had "independent incentives to moderate content" under *Murthy v. Missouri*, 603 U.S. 43, 60 (2024), and that Plaintiffs fail to allege an "ongoing pressure campaign" necessary for prospective relief. ECF No. 24-1, Defs.' Mem. at 8–15. But *Murthy* arose in a different procedural posture and involved ambiguous, behind-the-scenes government communications where no plaintiff could trace any specific content moderation decision to any specific defendant. Here, by contrast, the then-Attorney General told the nation she demanded removal of the app, Apple reversed a decision it previously reached after a thorough five-week legal review citing only "information provided to Apple by law enforcement," and the then-Attorney General characterized Apple's response as

---

[1] Since the filing of the Amended Complaint, Todd Blanche has succeeded Pamela J. Bondi as Acting Attorney General, and Markwayne Mullin has succeeded Kristi L. A. Noem as Secretary of Homeland Security. Under Federal Rule of Civil Procedure 25(d), each successor is automatically substituted as a party.

1

"compliance." Amend. Compl. ¶¶ 81, 115, 118, 122. There is no question about traceability when the actor takes full credit for what she has done. And here, the government's campaign is far from over — the then-Attorney General publicly stated she expects Apple to "continue to comply," *id.* ¶ 118, and the government has since pursued enforcement actions against others engaged in the same type of speech as Plaintiffs, *id*. ¶ 108. There is clearly standing on the coercion claim.

On the merits of the coercion claim, Defendants contend that Plaintiffs fail to allege communications that could be "reasonably understood to convey a threat of adverse government action" under *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191 (2024). Defs.' Mem. at 20–24. But in *Vullo*, the Supreme Court found a plausible coercion claim based solely on private meetings and guidance letters from a state regulator. Here, government officials did much more: the then-Attorney General publicly "demanded" removal and took credit when Apple complied — conduct far more explicit than anything alleged in *Vullo*. That Defendants have refused to disclose the substance of their private communications with Apple, Amend. Compl. ¶ 127, cannot be held against Plaintiffs at the pleading stage.

On Plaintiffs' retaliation claim, Defendants claim Plaintiffs lack standing because Aaron's injury is merely "subjective chill," *Laird v. Tatum*, 408 U.S. 1 (1972) his fear of prosecution is speculative, and the Amended Complaint emphasizes the effects of the government's retaliation on Aaron rather than ALL U Chart. Defs.' Mem. at 15–20. But Aaron's chill is not subjective — it is the very Hobson's choice that the Supreme Court expressly recognized as conferring standing in *Meese v. Keene*, 481 U.S. 465, 475 (1987): continue exercising his First Amendment rights and face potential prosecution or cease his protected speech. Here, four senior federal officials — including the nation's chief law enforcement officer — publicly accused Aaron of criminal conduct and warned him that he was under investigation. Aaron took several concrete steps in

2

response: he retained criminal counsel, switched to encrypted communications, altered his international travel, and abandoned development of an Android version of ICEBlock that would have reached forty percent of U.S. mobile users. Amend. Compl. ¶¶ 109, 135. These are not speculative fears of hypothetical future harm. They are the direct consequences of a government official telling Aaron on national television to "watch out."  And the government's threats against Aaron — as the sole developer and creator of the app — are threats against ALL U Chart. There is no ALL U Chart without Aaron. The government's campaign to silence Aaron necessarily chills ALL U Chart too.

On the merits of the retaliation claim, Defendants seek to characterize their threatening statements as mere government "criticism" of a citizen's speech that cannot constitute "adverse action." Defs.' Mem. at 24–27. But the then-Attorney General did not engage in a policy debate. She told the citizen he was under investigation and publicly warned him that his speech was "not protected." The then-DHS Secretary said his app "looks like obstruction of justice." The Acting ICE Director said DOJ was coordinating with his agency to determine "exactly what we can do" to prosecute the citizen. These are real threats of likely criminal prosecution or investigation from officials with the direct power to carry them out. Thus, Plaintiff Aaron satisfies every element of the D.C. Circuit's retaliation test: he engaged in protected speech; he suffered adverse actions sufficient to deter a person of ordinary firmness; and there exists a clear causal link between the Defendants' own words and the adverse actions. *See Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

For these reasons, as further explained below, the Government's motion to dismiss should be denied in its entirety.

3

**STATEMENT OF FACTS**

Plaintiffs incorporate by reference the factual allegations set forth in the Amended Complaint, ECF No. 22, and highlight the following facts most relevant to Defendants' motion.

**A. Aaron Develops the ICEBlock Application**

Plaintiff Joshua Aaron is a software developer and the founder and creator of ICEBlock. Amend. Compl. ¶ 23. ICEBlock is a smartphone application that allows members of the public to report publicly observable locations of ICE agents by tapping on a map. *Id.* ¶¶ 3, 61.

In the wake of the 2024 election and the incoming Administration's promises of a mass deportation campaign, Aaron sought to use his programming skills to help communities stay informed about immigration enforcement activity in their neighborhoods. *Id.* ¶ 57. Inspired by the community-sourced police speed-trap reporting features in Waze, Google Maps, and Apple Maps, Aaron began coding ICEBlock in early January 2025. *Id.* ¶ 58.

ICEBlock serves a wide range of purposes. *Id.* ¶ 78. For example, parents and caretakers can use ICEBlock to identify specific immigration enforcement activities so they can steer children and families away from potentially volatile encounters. *Id.* Community organizations can use it to dispatch legal observers to areas where enforcement activity has been reported. *Id.* Journalists can use it to identify and report on enforcement operations. *Id.* Individuals of all backgrounds — including U.S. citizens — can use it to stay informed about law enforcement activity in their neighborhoods. *Id.*

The mechanics of the app are relatively simple. *Id.* ¶¶ 59–60. Users within a five-mile radius of a reported sighting receive a push notification. *Id.* ¶ 69. Reports automatically expire after four hours. *Id.* ¶ 73. Users cannot upload photographs, videos, hyperlinks, or any other media in connection with a reported sighting. *Id.* ¶ 62. To ensure anonymity, there are no user accounts,

4

no usernames, no passwords, and no way for users to communicate with one another. *Id.* ¶¶ 62, 65. It is entirely free and generates no revenue. *Id.* ¶ 65.

ICEBlock incorporates multiple safeguards against misuse and to ensure accurate information: sightings can only be reported within five miles of the user's location, duplicate reports are blocked, users must wait five minutes between submissions, and all data is permanently deleted after four hours. *Id.* ¶¶ 69–73. Every screen of the application displays a prominent disclaimer: "Please note that the use of this app is for information and notification purposes only. It is not to be used for the purposes of inciting violence or interfering with law enforcement." *Id.* ¶¶ 74–76. This disclaimer has appeared on every version of ICEBlock since its first-published iteration. *Id.* ¶ 76.

### B.  Apple's Thorough Review and Approval of ICEBlock

In February 2025, Aaron submitted ICEBlock to Apple for review. *Id*. ¶ 85. Apple's app development review team and attorneys reviewed ICEBlock for compliance with the company's terms of service and lawful uses over approximately five weeks, including multiple WebEx video calls and communications involving members of Apple's legal department. *Id.* ¶¶ 81, 86–87. Apple initially rejected ICEBlock, then engaged in extensive back-and-forth with Aaron about the app's functionality, purpose, and technological specifics. *Id.* ¶¶ 86–88. After this thorough vetting process, Apple ultimately determined that ICEBlock was safe, lawful, and compliant, and approved it for distribution on April 2, 2025. *Id.* ¶ 91.

### C.  CNN Features ICEBlock Spurring Substantial Usership and Downloads

On June 30, 2025, CNN News Central aired a segment prominently featuring ICEBlock as part of a discussion about technology companies' responses to the Administration's immigration policies. *Id*. ¶ 93. The lead CNN reporter interviewed Aaron and reported that he "wanted to create an early warning system to let people know where ICE officers had been sighted," emphasizing

5

that Aaron made clear the app was for people to "know where ICE is located, but not to interfere with officers' activity." *Id.* ¶¶ 94–95.

The public response was immediate. Prior to the CNN feature, ICEBlock had approximately 20,000 users. *Id.* ¶ 96. Within less than a week, ICEBlock became the number one most-downloaded "Social Networking" application on Apple's App Store. *Id.* By July 1, 2025, it was the third most-downloaded application in the entire App Store. *Id.* By July 5, 2025, ICEBlock had 541,000 users. *Id.* By early October 2025, ICEBlock had grown to over 1.14 million users, gaining an average of 12,000 downloads per day. *Id.*

### D. The Coordinated Government Campaign to Squash ICEBlock and Punish Aaron

The same day CNN aired its story, four senior federal officials launched a coordinated campaign against the app and its creator. *Id.* ¶ 97.

- **Defendant Lyons** called ICEBlock "sickening" and stated that ICE was coordinating with DOJ "as far as prosecuting anyone that has impeded or interfered with ICE arrest. So that's what we're focusing on now with the Department of Justice — to see exactly what we can do." *Id.* ¶ 98.

- **Defendant Homan** called for an immediate DOJ investigation, stating: "DOJ is looking at it . . . So, I think DOJ will come to the point where these people will be held accountable . . . I know Pam Bondi is all over it." *Id.* ¶¶ 99–100.

- **Then-Attorney General Bondi** stated on Fox News that Aaron was "giving a message to criminals where our federal officers are," that "we are looking at it, we are looking at him, and he better watch out, because that's not protected speech. That is threatening the lives of our law enforcement officers throughout this country." *Id.* ¶ 101. Bondi also drew a viewpoint-based distinction between CNN "promoting" the app — which she characterized as unlawful — and Fox News "warning" about it — which she praised. *Id.* ¶¶ 102–03.

- **Then-Secretary of Homeland Security Noem** posted on X that ICEBlock "sure looks like obstruction of justice" and warned: "If you obstruct or assault our law enforcement, we will hunt you down and you will be prosecuted to the fullest extent of the law." *Id.* ¶ 104. The next day, Noem told reporters that DHS was "working with the Department of Justice to see if we can prosecute [CNN] for [the ICEBlock story], because what they're doing is actively encouraging people to avoid law enforcement activities, operations and we're going to actually go after them and prosecute them with the partnership of Pam [Bondi]." *Id.* ¶ 105.

6

Despite this barrage of public threats from the nation's most senior law enforcement officials, Apple did not act to restrict ICEBlock in any way or communicate any concerns to Aaron. *Id.* ¶ 107.

**E.  More Than Three Months Later, Apple Removes ICEBlock at the Government's Demand**

On October 2, 2025, with over 1.14 million users, Apple removed ICEBlock from the App Store. *Id*. ¶¶ 96, 110-111. Apple's public statement cited "information . . . received from law enforcement." *Id.* ¶ 121. Apple's private communication to Aaron stated that "[i]nformation provided to Apple by law enforcement" informed its decision to remove the application. *Id.* ¶ 122.

That same day, then-Attorney General Bondi stated on Fox News: "We reached out to Apple today demanding they remove the ICEBlock app from their App Store — and Apple did so." *Id.* ¶ 115. She later confirmed this in sworn testimony before the Senate Judiciary Committee, stating: "We fought — well we spoke with Apple and Google to get the ICEBlock app taken down." *Id.* ¶ 116. Senator Lee responded by emphasizing "how much work" DOJ had to do to get Apple to comply. *Id*. ¶ 117. On October 8, 2025, then-Attorney General Bondi stated publicly: "We had Apple and Google take down the ICEBlock apps. Hope they continue to comply with that." *Id.* ¶ 118.

This was the first known instance of Apple removing a U.S.-based app in response to U.S. government demands. *Id.* ¶ 129. Upon information and belief, Defendants have made no comparable demands regarding similar applications — including Waze, Google Maps, Apple Maps, Citizen, and Police Scanner — that crowdsource or track the location of law enforcement engaged in non-immigration related activities. *Id.* ¶ 130.

Then-Attorney General Bondi has refused to reveal publicly the substance of the government's communications with Apple. The DOJ has not produced the communications in

response to a Freedom of Information Act request and lawsuit and has not responded to a congressional letter from Rep. Jamie Raskin seeking those records. *Id.* ¶ 127.

### F.  The Concrete Impact on Plaintiffs

Following Defendants' threats, Aaron retained criminal legal counsel and devoted significant time and effort to prepare for a federal criminal investigation. *Id*. ¶ 109. He changed the way he communicates — switching to secure, encrypted messaging services only — and altered his international travel, refraining from carrying his primary mobile device and coordinating travel plans with counsel based on a concern that he would be detained and searched upon reentering the United States. *Id.* The threats have caused continuing stress to Aaron and his family. *Id.*

Following the government's coercion of Apple, Aaron has been unable to update ICEBlock or create new features, including a planned October 2025 update. *Id.* ¶ 131. Existing users cannot receive security updates or improvements. *Id.* Many previous users have lost access to ICEBlock entirely after replacing their iPhones, including Aaron himself. *Id.*

Unlike web-based content, iPhone applications cannot be distributed to U.S. users outside of Apple's App Store. Apple does not permit "sideloading" on iPhones sold or used in the United States. *Id*. ¶ 132. Thus, "when Defendants coerced Apple into removing ICEBlock from the App Store, they did not merely eliminate one distribution channel — they achieved the near complete suppression of ICEBlock for millions of iPhone users in the United States." *Id*. ¶ 133.

In response to the Defendants' threats and coercion of Apple, Aaron also abandoned plans to release a version of ICEBlock for the Android operating system, which runs on approximately forty percent of mobile devices in the United States. *Id.* ¶ 135.

**LEGAL STANDARDS**

Defendants move for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). On such a motion, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). At this stage, the Court does not weigh evidence or resolve factual disputes. *Vullo*, 602 U.S. at 194 (reversing Second Circuit's dismissal for improperly "taking the allegations in isolation and failing to draw reasonable inferences in the NRA's favor").

In contrast, in *Murthy v. Missouri*, the Supreme Court applied the preliminary injunction standard at which, "the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing," and because the parties had already taken extensive discovery, the plaintiff was *not* able to "rest on 'mere allegations,' but must instead point to factual evidence." 603 U.S. at 58 (quoting *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and *Lujan v Defenders of Wildlife*, 504 U.S. 561, 561(1992)).

**ARGUMENT**

I.    **PLAINTIFFS HAVE ARTICLE III STANDING TO ASSERT BOTH CLAIMS**

   **A. Plaintiffs Have Standing to Bring Their Coercion Claims**

To establish standing, Plaintiffs need only allege that they have suffered an injury-in-fact — an invasion of a legally protected interest that is concrete and particularized and actual or imminent — that was "fairly traceable" to the government and not the result of some independent action of a third party, and can be "likely" redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61. It cannot be contested that the suppression of "disfavored expression" is a concrete injury. *Vullo*, 602 U.S. at 188.

9

Here, Defendants do not dispute that Plaintiffs have sufficiently pleaded an injury-in-fact for their coercion claim: Plaintiffs' ability to disseminate speech and facilitate the speech of others has been severely burdened. Defendants dispute only that Plaintiffs adequately pleaded that the injury is traceable to the Defendants' actions, and that they might be entitled to injunctive relief. *See* Defs.' Mem at 9.

Each of those arguments must be rejected.

### i. Plaintiffs have sufficiently alleged traceability: that Apple removed ICEBlock from the App Store because the Attorney General coerced it to do so

On October 2, 2025, the date Apple removed ICEBlock from the App Store, then-Attorney General Bondi stated, "[w]e reached out to Apple today demanding they remove the ICEBlock app from their App Store — and Apple did so." Amend. Compl. ¶¶ 1, 115. Rarely in a jawboning case is there a statement that so directly and concisely captures the material act (express intent) and the cause and effect of government coercion to censor speech. The statement, standing alone, neatly establishes the traceability element of standing. Simply put: on October 2, 2025, the Attorney General "demand[ed]" that Apple remove ICEBlock from the App Store. *Id.* On that very same day, "Apple did so" — it complied with that demand and removed ICEBlock from the App Store. *Id.* ¶¶ 2, 16–17, 111, 121–122.

Defendants' argument that Plaintiffs lack standing to bring a coercion claim under *Murthy* misreads that decision and overstates Plaintiffs' burden at the pleading stage. Defendants claim that Plaintiffs lack standing under *Murthy* because the Amended Complaint "fails to establish that Apple did not remove ICEBlock from the App Store as a result of Apple's 'independent incentives to moderate content.'" Defs.' Mem. at 14. As shown above, the Amended Complaint plausibly alleges that that is exactly what happened here. Moreover, the plaintiffs' posture for standing in *Murthy* was entirely different. The plaintiffs there sought a preliminary injunction after the

development of an extensive record. 603 U.S. at 53 (citing to page 23,223 of the underlying record). Because plaintiffs sought a preliminary injunction, the plaintiffs were required to make a "clear showing" that they were "likely' to establish each element of standing." *Id.* at 58 (internal quotations omitted). And because the parties had already taken extensive discovery, the plaintiffs could *not* "rest on 'mere allegations,'" but instead had to establish standing by "point[ing] to factual evidence." *Id.* On the well-developed record before it, the Court held that the plaintiffs lacked standing because, among other things, no plaintiff could trace any specific content-moderation decision to any specific government defendant as required to establish standing for a coercion claim. *Id.* at 59.

At the pleading stage, by contrast, the Court must accept Plaintiffs' well-pleaded allegations as true. *See Ashcroft,* 556 U.S. at 678; *Twombly,* 550 U.S. at 570. Here, those allegations include the Attorney General's own public admission that she "demand[ed]" Apple remove ICEBlock "and Apple did so." Amend. Compl. ¶ 115. Standing alone, this statement supports the allegations that a particular defendant (the Attorney General) in a particular communication coerced a particular platform (Apple) to censor particular speech (the ICEBlock app), before the platform took its own action to do so. These are precisely the elements required to establish standing for jawboning claims, as articulated in *Murthy* at this stage of proceedings. *Cf.* 603 U.S. at 64–65 (no standing for plaintiff with "best showing of a connection between her social-media restrictions and communications between the relevant platform . . . and specific defendants" because "most of the lines she draws are tenuous, *particularly given her burden of proof at the preliminary injunction stage*—recall that she must show that her restrictions are *likely* traceable to the [specific defendants]") (emphasis added).

11

But the Attorney General's statement does not stand on its own. Numerous other allegations, and the reasonable inferences therefrom, support Plaintiffs' claim that their injury is directly traceable to the Defendants. In particular:

- The allegations that Senator Mike Lee commented to then-Attorney General Bondi, "It's stunning, I would add here, that it took as much work as it did by you to get them to take that down. . . . I'm glad that they have taken this 'Block ICE' app down, but it's a shame it took as long as it did and as much work on your part to get them to take it down" and that Bondi, testifying under oath, confirmed this account, Amend. Compl. ¶ 117, support the inference that the Attorney General pressured and coerced Apple and that Apple removed ICEBlock from the App Store as a result of the coercion and not as an independent decision. *Id.* ¶ 128.

- The allegation that then-Attorney General Bondi, during a public speech on October 8, 2025, stated, "We had Apple and Google take down the ICEBlock apps. Hope they continue to comply with that," *id.* ¶ 118, supports the same inference, especially by using the words "had [them] ... take down" and "comply," that Apple did not make an independent decision to remove ICEBlock. *Id.* ¶ 128.

- The allegations that Defendants and other senior members of the Trump Administration repeatedly publicly stated that the Department of Justice should investigate and prosecute ICEBlock, *id.* ¶¶ 98–105, including Defendant Homan stating that "Pam Bondi is all over it," *id.* ¶ 100, and then-Attorney General Bondi herself stating that "we are looking at it, we are looking at it, and he better watch out," *id.* ¶ 101, and then-DHS Secretary Noem calling ICEBlock "obstruction of justice," *id.* ¶ 104, support the inferences that the Department of Justice intended to coerce Apple to remove ICEBlock and that it will continue to do so unless enjoined.

- The allegation that the Attorney General refused to disclose the pertinent October 2, 2025, communications with Apple in response to both FOIA and Congressional requests, *id.* ¶ 127, further supports the inference that those communications were in fact coercive "demands" and not merely informational or mild persuasion. *Id.* ¶ 128.

- The allegations that Apple thoroughly reviewed ICEBlock and approved it and allowed it to remain on the App Store for six months until it received the Attorney General's "demand" and then removed it on the very same day, *id.* ¶¶ 81–91, 110–11, support the inferences that Apple did not make its own independent decision to remove ICEBlock on October 2, 2025, that its decision was instead coerced by the Attorney General, *id.* ¶¶ 111–12, and that Apple will reinstate ICEBlock should the Attorney General's coercion be enjoined. *Id.* ¶ 113.

- The allegations that Apple twice cited a standard that was materially different from its written App Review Guidelines in explaining its reason for removing ICEBlock to Aaron, *id.* ¶¶ 122-25, further supports the inference that Apple was in fact coerced to remove

12

ICEBlock, that the removal of ICEBlock was not its independent decision, and that its stated explanations for removing ICEBlock were pretextual.

These allegations, which the Court must accept as true, are starkly unlike the evidence adduced in *Murthy*.

Starkest is the timing. Apple removed ICEBlock the very same day the then-Attorney General demanded that it do so. *Id.* ¶¶ 112, 115. Thus, Apple's removal of ICEBlock was not a careful re-examination of ICEBlock after receiving information from the then-Attorney General; Apple took immediate action, without time or effort to investigate. Contrast *Murthy*, where the alleged coercive communications were received well after the platforms' moderation actions. *See* 603 U.S. at 60, 61–62 (explaining that generally "the platforms began to suppress the plaintiffs' COVID–19 content before the defendants' challenged communications started"); *id.* at 62–63 ("a causal link is possible only if the removal occurred *after* Facebook's communication with the CDC"); *id.* at 63 ("Each faced his first social-media restriction in 2020, before the White House and the CDC entered discussions with the relevant platforms."); *id*. at 65 ("Facebook began to reduce the reach of Hines' and Health Freedom's pages" "before the start of communications with the White House and the bulk of communications with the CDC").[2] Further, *Murthy* cited "the lack of specific causation findings with respect to any discrete instance of content moderation." *Id.* at 59. Unlike here, there was no showing made in *Murthy* that the government ever said, in effect, "we don't like this specific speech; take it down" and it was then taken down.

---

[2]   With respect to plaintiff Hines, whom the *Murthy* court noted made "the best showing" of causation and traceability, Facebook deplatformed one of her posts three months after a White House communication, not about her posts but about COVID-19 history and vaccine misinformation generally; the Court also rejected Hines's argument that the same White House communication led to Facebook giving her a warning about a post two years later. *Id.* at 65–66. The court rejected Hines's attempts to link a May 2022 Facebook action against her with a Centers for Disease Control and Prevention ("CDC") communication from over a year earlier, and an April 2023 Facebook collaboration with the CDC in November 2021. *Id.* at 66–67.

And while in *Murthy*, there was an extensive record of the social media platforms removing the plaintiffs' speech and similar speech prior to the identified governmental communications, here Apple had specifically approved ICEBlock prior to the government's demand; it had permitted ICEBlock to remain in the App Store after government criticism but before the allegedly coercive communication; and there is no record of Apple previously delisting similar apps or enforcing its guidelines under a relaxed foreseeability of harm standard. *Cf. id.* at 60, 64 (emphasizing plaintiff Hoft's admission that Twitter acted according to its own policies); *id.* at 68 (emphasizing that Facebook was targeting plaintiff Hines's posts before almost all of its communications with the government).

The other cases Defendants cite are distinguishable for similar reasons.

In *Changizi v. Department of Health & Human Services*, 82 F.4th 492, 497 (6th Cir. 2023), the plaintiffs failed to establish traceability because Twitter had started suspending those who violated its COVID-19 policy four months before the alleged coercive government communication. And rather than alleging any specific communication pertaining to the plaintiffs that preceded Twitter's actions against them, the complaint merely alleged unspecified "'behind the scenes communications' at some undisclosed point before the first public statements." *Id.* at 498. The Sixth Circuit acknowledged, however, that it would have held the allegations sufficient if "facts were alleged in the complaint that would allow a conclusion that, under the totality of the circumstances, Twitter's actions were compelled or coerced by the federal government." *Id.* Those are precisely the allegations here.

Likewise, in *Hart v. Facebook*, No. 23-15858, 2024 WL 1693355, *3 (9th Cir. April 19, 2024), the plaintiff failed to allege any coercive statements that were specifically about his posts, or even their subject matter.

Defendants argue that Plaintiffs' own allegations defeat the inference of coercion because Plaintiffs note that Apple cited its App Store Guidelines when removing ICEBlock. Defs.' Mem. at 9–11. But this argument ignores the critical distinction between what Apple said and *why* Apple acted. Plaintiffs do not dispute that Apple invoked Guideline 1.1.1 in its communications to Aaron. What Plaintiffs allege, and what the Court must accept as true, is that Apple's stated rationale was pretextual, and Apple would not have removed ICEBlock but for the then-Attorney General's "demand." Amend. Compl. ¶¶ 112, 115, 120. That Apple offered a post hoc justification for its compliance does not negate the inference of coercion. It is entirely consistent with it. *See Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (declining to credit a coerced company's post hoc claim that it acted for independent business reasons given the timeline of events).

As the foregoing shows, the Amended Complaint plausibly alleges that the government coerced Apple, which is all that a plaintiff must allege to establish standing at the motion to dismiss stage. "A plaintiff need not 'rule out every possible lawful explanation,' but rather only dispel any 'obvious alternative explanation[s].'" *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024) (applying *Iqbal* plausibility standard and reading the complaint "as a whole") (citations omitted). Standing is not defeated simply because the facts are consistent with an alternative lawful explanation; the court at the motion to dismiss phase does not choose between plausible explanations or ferret out the most likely reason for the defendants' actions. *Id.*; *accord VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) ("[A] complaint survives a motion to dismiss" when "there are two alternative explanations, one advanced by the defendant, and the other advanced by the plaintiff, both of which are plausible."). And the plausibility of the plaintiff's

15

explanation must be judged from the broader perspective of the complaint as a whole. *Ho*, 106 F.4th at 54.

As set forth above, Plaintiffs have pleaded a plausible explanation — that Apple was coerced to remove ICEBlock, exactly as then-Attorney General Bondi stated. That explanation is supported by at least three independent facts that, taken together, support the inference that Apple's actions were not based on independent platform judgment: (1) Apple acted immediately after receiving the then-Attorney General's demand, and thus did not make a studied reevaluation of ICEBlock; (2) Apple's stated reason for removal, that "information provided to Apple by law enforcement," did not apply the standard set forth in its own written App Review Guidelines, *id.* ¶¶ 122–25; and (3) the then-Attorney General herself characterized Apple's response as "compl[iance]" with a government "demand." *Id.* ¶¶ 115, 118. Again, unlike *Murthy*, the Court here must accept Plaintiffs' allegations as true and draw all reasonable inferences in Plaintiffs' favor. Perhaps it is *possible*, as Defendants contend, that Apple acted independently, but Plaintiffs' explanation is clearly a plausible one, which is all that is required at the pleading stage.

### ii. Plaintiffs' injuries are redressable by the requested injunctive relief because they have sufficiently alleged continued, ongoing injury and a substantial threat of future harm

In order to establish standing for injunctive relief, plaintiffs must plead one of two things: actual "continuing" injury that can be remedied by an injunction, *Anatol Zuckerman and Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1363 (D.C. Cir. 2023) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)), or "a threatened injury that is certainly impending or a substantial risk that the future harm will occur." *Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021) (citations omitted)*;see also Escobar Molina v. DHS*, 811 F.Supp.3d 1, 33 (D.D.C. 2025) (exposure to unlawful policy is both "ongoing harm" and evidence of imminent harm) (citing *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979 (D. Ariz. 2011)) *aff'd sub nom. Melendres*

16

*v. Arpaio*, 695 F.3d 990 (9th Cir. 2012); *Richman v. United States*, 350 F.R.D. 401, 411 (D.D.C. 2025) (describing continued injury without court intervention). Allegations of past illegal conduct, while not determinative, remain relevant "for their predictive value", and can make it easier for a plaintiff to prove a traceable continuing injury. *Murthy*, 603. U.S. at 59; *see also Jibril*, 20 F.4th at 814. Inferences may also be supported by the defendants' failure to provide evidence to the contrary. *Id.* at 816–17. As with causation, at the motion to dismiss stage, a plaintiff's allegation of future harm need only be plausible. *Id.* at 814.

A plaintiff bringing a jawboning claim has standing to seek to enjoin the government action that caused her injury, even if she cannot guarantee that a favorable outcome will cause the third party to change course. Instead, a plaintiff need only show that a favorable decision enjoining the government's unconstitutional conduct would create "'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury'" inflicted by the third party. *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020) (quoting *Klamath Water Users Ass'n v. FERC,* 534 F.3d 735, 739 (D.C. Cir. 2008)). The plaintiff need not show that the third party will definitely revert to its pre-coercion position. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 261–62 (1977) (redressability satisfied where injunction would remove zoning barrier, even though Court could not guarantee developer would build housing); *Parsons v. Dep't of Justice*, 801 F.3d 701, 717 (6th Cir. 2015) ("it is reasonable to assume a likelihood that the injury would be partially redressed" even though court did not know how declaratory judgment might affect actions of third-party law enforcement officers).

Thus, where a plaintiff alleges ongoing censorship from the government's action, she need not prove that her speech will be restored once legal impediments are lifted. It suffices to show

17

that, if the case succeeds, future decisions will be made without the government's coercion. *See, e.g., Council for Periodical Distribs. Ass'n v. Evans*, 642 F. Supp. 552, 560 (M.D. Ala. 1986) (publishers' claims were redressable because the challenge would ensure that future decisions about hosting the publishers' content "would be made free of coercion and without prior restraint"); *see also Backpage.com,* 807 F.3d at 239 (remedying a First Amendment violation by prohibiting the government from engaging in further coercion).

Here, Plaintiffs have sufficiently pleaded that the Defendants' coercion of Apple to remove ICEBlock from the App Store continues to cause ongoing harm is part of a larger and ongoing policy of suppressing user content tracking immigration activity, and is a continuing part of the government's aggressive immigration enforcement policies and practices, all of which create a substantial risk that future harm will occur.

To begin, Defendants' coercion of Apple is "continuing." The then-Attorney General stated, with respect to Apple, that "we hope they *continue* to comply," Amend. Compl. ¶ 118 (emphasis added), with the demand that ICEBlock be removed from the App Store—implying negative consequences if Apple stops complying and restores ICEBlock. And notably, nowhere in Defendants' motion do they disavow their belief that ICEBlock was rightfully removed from the App Store or say anything that would imply that they would permit Apple to restore it. Aaron has amply pleaded that he is suffering a continuing injury from this ongoing coercion. He has been unable to update or create new features for ICEBlock; the quality of ICEBlock for existing users is degrading; and he and many other users have lost access to it when they got new phones. *Id.* ¶ 131. Aaron continues to have no meaningful way to distribute ICEBlock to people who want to use it. *Id.* ¶ 134. This alone is enough for an injunction.

Independently, there is "substantial risk" that Defendants again will coerce Apple, and other platforms like Google Play Store, to ban ICEBlock if Aaron submits a new version, which he planned to do prior to Defendants' actions. *Id.* ¶¶ 118, 131, 135. Indeed, the inference that Defendants will continue to seek to ban ICEBlock is well supported by the allegations that the Administration sought to ban other ICE reporting apps and websites after its success with ICEBlock.[3] *Id.* ¶ 136. Defendants prioritized a policy of mass deportation even before assuming office, issued numerous orders and official policy statements consistent with that policy, implemented aggressive enforcement measures by ICE once in office, and have since investigated individuals who have lawfully documented ICE activity. *Id.* ¶¶ 30-51, 92, 108.

*Murthy* does not require a different result. Again, *Murthy* was decided on a more burdensome preliminary injunction standard with an extensive, developed factual record. That record indicated that the government's threats to the social media platforms about COVID-19 had subsided and become, at most, sporadic at the time plaintiffs filed the action. 603 U.S. at 72. Here, by contrast, as discussed *supra*, Plaintiffs have plausibly alleged continuing coercion, leading to an ongoing injury and threat of future harm. The *Murthy* Court noted, after exhaustively reviewing the evidence adduced in discovery, that "without *proof* of an ongoing pressure campaign, it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." 603 U.S. at 69 (emphasis added). But here, where there is as of yet no evidentiary record and where the Court must accept the allegations in the Amended Complaint as true, Plaintiffs have more than sufficiently alleged an ongoing pressure campaign. Plaintiffs

---

[3] As described in a similar lawsuit, platforms like Apple and Facebook have removed several other webpages and apps that track immigration activity after similar demands from Defendants. *See Rosado v. Bondi*, 1:26-cv-01532, ECF. No. 1 (N.D. Ill.). The Court may take judicial notice of government officials' public demands in the cited complaint because they are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b).

accordingly have standing to seek injunctive relief to address these ongoing injuries from an unlawful and continuing government policy of coercing application stores to deplatform ICE monitoring applications.

### iii. Alternatively, the Court should grant targeted jurisdictional discovery into Defendants' non-public communications with Apple

As shown above, Plaintiffs have sufficiently pleaded that they have standing to bring their First Amendment coercion claim. Should the Court nonetheless have concerns regarding its subject-matter jurisdiction, Plaintiffs request that the Court grant them leave to discover the contents of the non-public communications the then-Attorney General and Doe Defendants sent to Apple regarding ICEBlock.

"[W]here issues arise as to jurisdiction . . . discovery is available to ascertain the facts bearing on such issues." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978). "A plaintiff need only have a 'good faith belief' that 'reasonable discovery' could 'supplement . . . jurisdictional allegations . . . .'" *Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023) (citations omitted). Plaintiffs have a good-faith belief that the contents of the non-public communications of the then-Attorney General and Doe Defendants sent to Apple will confirm that Apple removed ICEBlock due to unconstitutional coercion by government officials. These facts will establish Plaintiffs' standing and assure this Court of its subject-matter jurisdiction. Defendants' motion to dismiss faults Plaintiffs for failing to allege the contents of these non-public communications with Apple. Defs.' Mem. at 10. But, of course, Plaintiffs cannot know the contents of communications they have not seen and cannot otherwise access. If the Court is persuaded that the contents of these non-public communications are necessary for Plaintiffs to establish standing at this early stage, Plaintiffs should be permitted to seek narrow jurisdictional discovery for those communications. *See Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998).

20

### B. Plaintiffs Have Standing for Prospective Relief on the Retaliation Claim

Defendants argue that Plaintiff ALL U Chart lacks standing to assert a First Amendment retaliation claim because the allegations in the Amended Complaint focus on Plaintiff Aaron, Defs.' Mem. at 20, n.3, and that Plaintiff Aaron lacks standing to assert his retaliation claim because he alleges only a "subjective chill" insufficient under *Laird v. Tatum*, 408 U.S. 1 (1972), and his fear of prosecution is speculative. Defs.' Mem. at 15–20. The arguments as to both Plaintiffs fail.

Aaron has standing because the Defendants' threats forced him into a Hobson's choice between continuing to exercise his First Amendment rights and facing potential federal prosecution or ceasing his protected speech — a choice the Supreme Court has long recognized as a concrete, cognizable injury. Aaron's injury is directly traceable to each of the named Defendants' own public statements and an injunction would redress it. Likewise, ALL U Chart has standing to raise a retaliation claim. ALL U Chart owns all intellectual property associated with ICEBlock. Amend. Compl. ¶ 24. As the government acknowledges, *see* Defs.' Mem. at 16, Plaintiffs allege that then-Secretary Noem characterized the ICEBlock App as " reckless and criminal" in testimony before the Senate Judiciary Committee, Amend Compl. ¶ 116, and as "obstruction of justice" in a post on X, *id.* ¶ 104, while threatening to "hunt down" and "prosecute to the fullest extent of the law" those who "obstruct or assault our law enforcement," *id.* The government's campaign to brand the app as criminal, to threaten its creators and users, and to coerce its removal directly harmed ALL U Chart's property interest and business. Furthermore, the threats against Aaron — as the sole developer and public face of the app — are functionally threats against the enterprise. One cannot threaten to prosecute the sole creator and developer of a company's product, *id.* ¶ 3, without chilling the company's speech.

21

i.   **Plaintiffs have suffered an injury-in-fact: Each of the Defendants made threats forcing Plaintiffs into a Hobson's choice between speech and prosecution**

To establish standing for prospective relief, a plaintiff must show "a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. In the First Amendment context, the Supreme Court has recognized that when government action forces a plaintiff to choose between forgoing speech and suffering concrete harm, the "need to take such affirmative steps to avoid the risk of harm" is itself a cognizable injury. *Meese*, 481 U.S. at 475.

In *Meese*, a state senator wished to exhibit three Canadian films classified as "political propaganda" under the Foreign Agents Registration Act. The Supreme Court held that the plaintiff had standing because he demonstrated — through empirical evidence including a Gallup poll showing 49.1% of voters would be less inclined to support a candidate who exhibited films with a "political propaganda" label — that the government's classification forced him into a concrete choice: forgo the speech or suffer measurable harm. *Id.* at 473–75. The Court held that this was "more than a 'subjective chill'" and constituted a cognizable injury. *Id.* at 473.

Aaron faces a more severe version of the same Hobson's choice. The Attorney General of the United States publicly declared on national television that Aaron's conduct is criminal, that "we are looking at him," and that he should "watch out, because that's not protected speech." Amend. Compl. ¶ 101. The DHS Secretary said ICEBlock "sure looks like obstruction of justice." *Id.* ¶ 104. The Acting ICE Director announced he was coordinating with DOJ to prosecute. *Id.* ¶ 98. And the White House Border Czar called for a DOJ investigation. *Id.* ¶ 99.

These threats forced Aaron to choose between continuing to develop and distribute ICEBlock — and face likely federal prosecution — or ceasing his protected speech. Unlike *Meese*, where the harm was primarily reputational, Aaron faced (and continues to face) a specific threat of criminal prosecution and loss of liberty. His response was concrete and documented: he retained

22

criminal legal counsel, switched to encrypted communications, altered his international travel by not carrying his primary mobile device and coordinating travel plans with counsel, and abandoned development of an Android version of ICEBlock that would have reached approximately forty percent of U.S. mobile users. Amend. Compl. ¶¶ 109, 135.

These are not the speculative fears of hypothetical future harm that the Court in *Laird v. Tatum* found insufficient. In *Laird*, the plaintiffs alleged that the mere existence of an Army intelligence data-gathering program chilled their speech. 408 U.S. at 10–11. The Court held that a chilling effect arising "merely from the individual's knowledge that a governmental agency was engaged in certain activities" was insufficient because the challenged action was not "regulatory, proscriptive, or compulsory in nature." *Id.* at 11, 13–14.

Aaron's case is the opposite of *Laird*. The government action here is not passive data-gathering of which Aaron happens to be aware. It is the Attorney General of the United States publicly declaring on national television that *his* conduct is criminal and that *he* should be under investigation. It is the DHS Secretary calling *his* app "obstruction of justice." It is the Acting ICE Director announcing coordination with DOJ to prosecute *him*. These are direct, specific, public threats concerning prosecution from officials with the power to carry them out — precisely the kind of "regulatory, proscriptive, or compulsory" government action that *Laird* held was necessary to establish standing. *Id.* at 11.

Nor is this the "highly attenuated chain of possibilities" that the Court in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) found insufficient. In *Clapper*, attorneys and human rights organizations challenged a federal surveillance statute, claiming their communications with overseas contacts were likely to be intercepted. *Id.* at 407. The Court held they lacked standing because their theory of injury required a speculative sequence of contingent

23

government decisions — that the government would target their particular contacts, choose to use the challenged surveillance method rather than other available tools, obtain FISC approval, successfully intercept the communications, and incidentally acquire the plaintiffs' own messages. *Id*. at 410. Here, in contrast, the causal chain is much more direct: the defendants publicly threatened Aaron by name and Aaron changed his behavior in documented, concrete ways as a direct result.[4]

In the First Amendment context, standing requirements are applied with "special solicitude" by courts in this circuit. *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 14–15 (D.D.C. 2018) (citing *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135 (D.C. Cir. 2015)). Standing "to challenge laws burdening *expressive rights* requires only a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law." *Green v. U.S. Dep't of Justice*, 392 F. Supp. 3d 68, 83 (D.D.C. 2019) (quoting *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016)). Here, Aaron has done far more than make a "credible statement of intent." *Id.* Although he continued to engage in his protected speech following the government's threats, he also documented concrete behavioral changes — retaining counsel, altering communications, changing travel patterns, and abandoning

---

[4]     The government contends, "Aaron simply has not alleged a present objective harm, and he cannot manufacture standing by chilling himself in anticipation of some hypothetical future retaliatory action that is not certainly impending." Defs.' Mem. at 19. But Aaron did not impose costs on himself based on speculation about what the government might do. He responded to what the government told him it *was* doing. The Attorney General publicly stated he was under investigation and warned him to "watch out." In such a situation, Aaron's decision to retain counsel, secure his communications, and alter his travel is not the "manufacture" of standing — it is the foreseeable and reasonable consequence of the government's threatening conduct. The Supreme Court recognized as much in *Meese*, holding that "the need to take such affirmative steps to avoid the risk of harm" is itself a cognizable injury. 481 U.S. at 475.

a major development project — made in direct response to the defendants' public pressure. This is the paradigmatic Hobson's choice that *Meese v. Keene* recognized as a cognizable injury.

### ii. Plaintiffs' injuries are directly traceable to the Defendants' conduct

Unlike in *Murthy*, where the plaintiffs could not trace any content-moderation decision to a specific government defendant because an independent intermediary (the social media platforms) broke the causal chain, 603 U.S. at 58–61, the retaliation claim in Count Two involves no intermediary. The causal chain runs directly from the named defendants to Aaron and ALL U Chart.

There is no third party exercising independent judgment in this chain. Defendants named Aaron and ICEBlock specifically, on national television. Aaron and the app he created are the direct target of their threats. Defendants' own public statements establish the causal link:

- Then-Attorney General Bondi stated: "we are looking at it, *we are looking at him*, and *he better watch out*, because that's not protected speech." Amend. Compl. ¶ 101 (emphasis added).

- Then-Secretary Noem posted that ICEBlock "sure looks like obstruction of justice" and told reporters DHS was "working with the Department of Justice to see if we can prosecute." *Id.* ¶¶ 104–105.

- Lyons stated DOJ was coordinating "as far as prosecuting anyone that has impeded or interfered with ICE arrest." *Id.* ¶ 98.

- Homan stated: "DOJ is looking at it…. I know Pam Bondi is all over it." *Id.* ¶ 100.

These statements are not ambiguous. They identify Aaron's specific conduct (creating and distributing ICEBlock), characterize it as criminal, and invoke the machinery of federal prosecution. Aaron's documented behavioral changes are the direct, predictable consequence of these threats.

### iii. Defendants' own actions — including enforcement against similarly situated speakers and the successful suppression of ICEBlock — confirm the credibility of their threats

Defendants' threats are credible for four independent reasons.

25

*First*, **the Defendants have never disavowed their threats.** None of the Defendants has retracted the statements characterizing Aaron's conduct and ICEBlock's content as criminal. To the contrary, then- Attorney General Bondi confirmed them in sworn Senate testimony on October 7, 2025, and again in a public speech on October 8, 2025. Amend. Compl. ¶¶ 116, 118. The failure to disavow enforcement weighs in favor of standing. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) (finding claims justiciable where "[t]he Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do."); *see also Woodhull Freedom Foundation*, 948 F.3d 373 (finding "ample reason to conclude that the threat of future enforcement against [plaintiff] is substantial" in pre-enforcement challenge where the DOJ "'has not disavowed any intention of invoking the criminal penalty provision' against individuals" who engage in conduct like plaintiff) (citations omitted).

*Second*, **the government has taken enforcement action against others engaged in the same type of speech.** In September 2025, DHS issued subpoenas to Meta targeting the social media accounts of "LBProtest" in California and "MontCo Community Watch" in Pennsylvania — individuals engaged in the same type of speech as Aaron and ICEBlock (publicizing ICE enforcement actions). Amend. Compl. ¶ 108. This enforcement against similarly situated speakers is "ample demonstration" that the threat of enforcement is not "'chimerical.'" *Steffel v. Thompson,* 415 U.S. 452, 459 (1974) (quoting *Poe v. Ullman*, 367 U.S. 497, 508 (1961)).

*Third*, **the Defendants have already acted on their threats.** Then-Attorney General Bondi publicly took credit for demanding Apple remove ICEBlock and Apple complied the same day. Amend. Compl. ¶ 115. While the coercion of Apple is the basis for Count One, it is independently significant for Count Two because it eliminates any suggestion that the Defendants' threats of prosecution are mere rhetoric. A government official who publicly warns

26

a citizen to "watch out," and then successfully causes the removal of that citizen's speech from the nation's largest app distribution platform, has demonstrated that her threats carry real consequences. The question is not whether Defendants are willing to act against Plaintiffs' speech — they already have.

*Fourth*, **Defendants' ongoing campaign has not ceased.** The Amended Complaint alleges that the threats "continue to this day as part of [an] ongoing coordinated campaign to silence those who provide the public information about ICE activities." Amend. Compl. ¶ 160. And then-Attorney General Bondi publicly stated she expected Apple would "continue to comply" with DOJ's demands. *Id.* ¶ 118.

### iv.  An injunction would redress Plaintiffs' injuries

Aaron seeks an injunction prohibiting the Defendants from threatening, investigating, or prosecuting him for his protected speech. *Id*. ¶ 167. Such an injunction would directly redress his injury by removing the Hobson's choice the Defendants' threats have imposed. If the Defendants are enjoined from threatening prosecution, Aaron would no longer face the forced choice between continuing to develop ICEBlock and facing potential federal prosecution. He could resume development of the Android version of ICEBlock, communicate without the need for encrypted messaging, and travel without altering his patterns to avoid potential detention.

The D.C. Circuit has recognized that "[t]he second and third standing requirements — causation and redressability — are often 'flip sides of the same coin.'" *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024) (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). Because Aaron's injury is directly traceable to the Defendants' threats, enjoining those threats going forward would directly redress the injury.

## II.    PLAINTIFFS STATE A VIABLE FIRST AMENDMENT COERCION CLAIM

On the merits, Plaintiffs state a claim that the then-Attorney General and Doe Defendants coerced Apple to remove ICEBlock from the App Store. Using the then-Attorney General's own words, the Amended Complaint alleges that the top law enforcement official in the country and her agents "demand[ed]" and fought with Apple to "comply" and remove the app. Amend. Compl. ¶¶ 115–18. This happened as the Attorney General and other partners publicly vowed to investigate and criminally prosecute ICEBlock and other organizations that promoted or facilitated the app. In context, this could be reasonably understood as a threat to prosecute Apple if it did not remove the app.

The government's motion ignores the then-Attorney General's public statements and fails to credit the inferences from them. Defs.' Mem. 20–24. But these statements and inferences are more than sufficient to state a coercion claim. To state a claim for government coercion of a third-party platform, Plaintiffs need only "plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Vullo*, 602 U.S. at 191. Courts look to many factors to determine whether government officials engaged in impermissible coercion, including the government official's authority; the communications themselves; surrounding context; and the reaction of the coerced party. *Id.* at 191–94. *See also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). These factors are a "useful, though nonexhaustive, guide." *Vullo*, 602 U.S. at 191. Analyzing any of these factors in "isolation" can contribute to a "mistaken conclusion." *Id.* at 199 (Gorsuch, J., concurring).

Applying these factors, the allegations in the Amended Complaint make clear that the government officials' conduct here amounted to coercion of Plaintiffs' speech. Notably, Defendants do not dispute that ICEBlock constitutes "plaintiff's speech." *Id.* at 191. *See also*

28

*Moody v. NetChoice*, 603 U.S. 707, 731 (2024) (discussing compilation as expressive activity); *Price v. Garland*, 45 F.4th 1059, 1070–71 (D.C. Cir. 2022) (discussing right to document government officials performing public duties). Nor do Defendants dispute that their actions were taken to "punish or suppress" that speech. *Vullo*, 602 U.S. at 191. They thus waive those arguments, and for good reason.

### A. The Attorney General and Doe Defendants Have Direct Civil and Criminal Authority to Investigate and Prosecute Apple

"Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191–92.

The Attorney General is the paradigmatic example of an official with vast enforcement authority that, by dint of the office, creates a heighted risk of coercion. As the head of the DOJ and chief law enforcement officer of the Federal Government, the Attorney General has extraordinary power to initiate civil and criminal investigations and prosecutions. *See* Judiciary Act of 1789, 1 Stat. 93. Indeed, the Supreme Court in *Vullo* used one of the Attorney General's subordinates as its example of an official with powerful enforcement authority. *Vullo*, 602 U.S. at 192 (noting "[o]ne would reasonably expect [an] organization to react differently" if it receives a "strongly worded letter" "from, say, the U. S. Attorney for the Southern District of New York than if it came from an out-of-state school board."). *See also Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606, 660 (E.D. Pa. 2004) (holding that Internet Service Providers could not freely ignore informal content-blocking notices sent by state prosecutors and that compliance with such notices was not voluntary). Aside from the President, there is no other official with greater or more direct authority over domestic law enforcement than the Attorney General. It is hard to imagine that any company conducting business in the United States would feel free to disregard the

29

demand. Apple, moreover, is acutely aware of the Attorney General's enforcement authority, given that, for example, the DOJ sued Apple as recently as 2024 for antitrust concerns.[5]

### B. Defendants' "Demand" to Apple Constitutes a Threat to Investigate and Criminally Prosecute Apple if It Did Not "Comply"

When evaluating government coercion, courts consider "who said what and how." *Vullo*, 602 U.S. at 191. Moreover, "threats need not be explicit." *Id.* at 193. Instead, "thinly veiled threats" may be just as coercive as their explicit counterparts. *Bantam Books*, 372 U.S. at 68. "How" something is said is as relevant as "what" was said. *Vullo*, 602 U.S. at 191.

Considering the context in which Defendants' statements were made, Plaintiffs have sufficiently alleged that the Attorney General threatened Apple that it would be investigated and prosecuted if it did not remove ICEBlock from the App Store.

The Amended Complaint highlights the then-Attorney General's own description of her and her associates' hostile communications with Apple. Amend. Compl. ¶¶ 115–18. As described and quoted above, the then-Attorney General characterized the communications as a "demand" requiring Apple to "comply"; and it came during a "fight" that took "much work" from the government. *Id.*

The Attorney General's demand to Apple carried an implicit threat of investigation and prosecution, which had been directly threatened against CNN, a company in a similar position. When the top lawyer and law enforcement authority in the country "demands" something, she means "the assertion of a legal or procedural right." Black's Law Dictionary (12th ed. 2024). A "demand" is more than a "request." *Backpage.com,* 807 F.3d at 232. Instead, demands are "phrased

---

[5]    U.S. Department of Justice, *Justice Department Sues Apple for Monopolizing Smartphone Market* (March 21, 2024), https://www.justice.gov/archives/opa/pr/justice-department-sues-apple-monopolizing-smartphone-markets.

virtually as orders." *Bantam Books*, 372 U.S. at 83. In *Backpage.com*, a local sheriff wrote a letter to credit card companies to "request that your institution immediately cease and desist from allowing your credit cards to be used to place ads on websites like Backpage.com," while also citing a criminal money-laundering statute. 807 F.3d at 231–32. In a subsequent press release, the Sherriff—as here—described his communications as a "demand." *Id.* at 232. These actions, the Seventh Circuit held, amounted to coercion. *Id.*[6]

Defendants' motion ignores these statements, providing no explanation why they are insufficient to plausibly allege that the statements (individually or in totality) establish coercion of Apple. Instead, the motion focuses on the Plaintiffs' inability to allege the content of non-public communications between Apple and the Attorney General and Doe Defendants. Defs.' Mem. at 20–21. But nowhere in *Vullo* does the court require an exact readout of underlying communications to survive a motion to dismiss. 602 U.S. at 191 (describing "just helpful guideposts"). Moreover, as explained above, this Court can credit as true the Attorney General's own public characterizations of those non-public communications with Apple. Thus, although it is correct that the government has concealed the actual content of the underlying communications with Apple from public view, Amend. Compl. ¶ 127, the Amended Complaint contains far more than "speculation as to the content of any direct communications." *Contra* Defs.'Mem. at 21.

---

[6]    Moreover, in a separate area of criminal law, certain demands necessarily "carry with them an implicit threat." *United States v. Smith*, 950 F.3d 893, 895 (D.C. Cir. 2020). For example, a bank robber's demand for cash carries an implicit threat of violence if money is not produced. *Id.*

## C. Defendants' Demand Should Be Understood in the Context of Similar Prosecution Threats

The Attorney General's and other officials' statements about ICEBlock's supposed illegality made clear that Apple — as a company that was promoting or facilitating ICEBlock's use in its App store — was a potential target of criminal investigation under the government's flawed legal theory. *Vullo*, 602 U.S. at 193 ("Other allegations, viewed in context, reinforce the [Plaintiffs'] First Amendment claim."). In their public statements, other government officials — who all claimed they were coordinating with the Attorney General — vowed to investigate and criminally prosecute ICEBlock and other organizations that promoted ICEBlock. Amend. Compl. ¶¶ 98, 100–01, 104–05. In their public statements, these officials threatened prosecutions under criminal statutes related to obstruction, interference with federal officers, and disclosing personal information of federal officials with the intent to threaten. *Id.*

Specifically, on June 30, 2025, the Attorney General said ICEBlock "better watch out, because that's not protected speech." *Id.* ¶ 101. On June 30, 2025, then-Secretary Noem said the ICEBlock app "sure looks like obstruction of justice." *Id.* ¶ 104. And in "partnership" with the Attorney General, then-Secretary Noem vowed to "go after them and prosecute them" — referring to both ICEBlock and CNN for reporting about the app. *Id.* ¶ 105. On June 30, 2025, Homan, referring to both ICEBlock and CNN, said "these people will be held accountable" for assault and/or "doxxing" — noting the Attorney General is "all over it." *Id.* ¶ 100. On June 30, 2025, when referring to ICEBlock, Lyons said: "We've been very aggressive with the Department of Justice. They've been great partners with us as far as prosecuting anyone that has impeded or interfered with ICE arrest." *Id.* ¶ 98.

Defendants incorrectly attempt to focus exclusively on "direct communications between Attorney General Bondi and the Doe Officials, and Apple," Defs.' Mem. at 21, to the exclusion of

32

everything else. Yet Defendants' conduct should be viewed "in context." *Vullo*, 602 U.S. at 191. Focusing too closely on any one fact to the exclusion of others can contribute to a "mistaken conclusion." *Id.* at 199 (Gorsuch, J., concurring).

Defendants similarly misread *Murthy* — a case about Article III standing at the preliminary injunction stage — to argue that surrounding context is not relevant to a coercion claim. Defs.' Mem. at 23 (citing *Murthy,* 603 U.S. at 61). *Murthy* did not involve government officials who were all proudly "partner[ing]" together to target a single app. Amend. Compl. ¶¶ 98, 105. Moreover, for the purposes of this coercion claim, the public statements of other government officials show how Apple "reasonably understood," *Vullo*, 602 U.S. at 177, the Attorney General's demand — given high profile, coordinated threats against similarly situated companies.

### D. Apple's Unprecedented and Immediate Reaction Shows Defendants' Conduct Was Understood as a Threat

Finally, Apple's immediate reaction to remove ICEBlock from the App Store after hearing from the Attorney General and Doe Defendants confirms the government's coercion. *Vullo*, 602 U.S. at 191 (considering "what reaction followed"). *See also Bantam Books*, 372 U.S. at 68 (considering that the coercion "in fact stopped the circulation" of the relevant speech).

The ultimate question, however, is an objective one: whether the challenged communication "is reasonably understood" to be a coercive threat. *Vullo*, 602 U.S. at 189. Defendants overlook this factor entirely. Defs.' Mem. at 20–24.

Well before the then-Attorney General's demand, Apple and its legal team performed a comprehensive review of ICEBlock and approved it. Amend. Compl. ¶¶ 81–91. Then, on the same day that the Attorney General made her demand, Apple reversed course and removed the app. Apple's decision was unprecedented. The company has never publicly reported a similar takedown based on a U.S. government demand. *Id.* ¶ 129. Most importantly, Apple said its decision was

based on "information we've received from law enforcement." *Id.* ¶ 121. Looking at the timeline, Apple previously distributed ICEBlock for months without issue. Then within hours of the Attorney General's and Doe Defendants' communications, Apple removed ICEBlock from its App store.

It is of little significance that Apple cited its own policies when removing the app. As Plaintiffs alleged, this was pretextual and a misstatement of Apple's own policy. *Id.* ¶ 120–23. And Apple's after-the-fact reasoning fails to account for the timeline of Apple's near instantaneous response. Moreover, for reputational and business purposes, it is common for large companies to attempt to cover up the government's coercion. In *Backpage.com*, for example, a coerced credit card company filed an affidavit stating that it did not feel threatened by the sheriff who was making veiled threats against the company. 807 F.3d at 233. But given the timeline of events in that case, the court could not credit that explanation at the preliminary injunction stage: "If . . . the credit card companies cut off Backpage 'for independent business reasons,' why hadn't they done that years earlier?" *Id*. The same is true here, especially at the motion to dismiss stage. If Apple wanted to remove ICEBlock for independent business reasons, it could have done so months earlier when it approved the app, or at any time thereafter, prior to the government's coercion. Amend. Compl. ¶ 91.

Finally, the Defendants are misguided in arguing that Apple's initial rejection of the app proves that its final removal was based on independent judgment. Defs.' Mem. at. 11. As is common, Apple's app review team initially rejected the app, and its legal team subsequently engaged in a more comprehensive review that involved questions about the app's purpose and functionality. Amend. Compl. ¶¶ 86–88. After gaining a better understanding of ICEBlock, Apple approved it. *Id.* ¶ 91. This comprehensive review helps show that Apple made a deliberate and

reasoned decision when approving ICEBlock and finding that ICEBlock satisfied its own internal App Store Guidelines. This is in stark contrast to its knee-jerk removal shortly after the Attorney General and Doe Defendants' communications. And the differences between the two underscore that Apple removed the app only after coercion from the Defendants.

## III.    PLAINTIFFS STATE A VIABLE FIRST AMENDMENT RETALIATION CLAIM

Defendants argue that Plaintiffs' retaliation claim fails on the merits because the Defendants' public statements amount to nothing more than permissible government criticism of a citizen's speech. Defs.' Mem. at 24–27. This argument fundamentally mischaracterizes what the Defendants said and ignores the D.C. Circuit's governing test for First Amendment retaliation.

In this Circuit, a plaintiff asserting First Amendment retaliation must show: "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (internal citation and quotation omitted). The Amended Complaint satisfies each element.

### A.  Plaintiffs Engaged in Protected Speech

Aaron's creation, distribution, and promotion of ICEBlock is protected by the First Amendment. Software applications that communicate information to users are themselves a form of speech protected by the First Amendment. *See Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) (computer-generated expression that "communicate[s] ideas" and "even social messages" qualifies for First Amendment protection). Amend. Compl. ¶ 139. ICEBlock facilitates the sharing of publicly observable location information — speech that lies at the heart of the First Amendment's protections. *See White v. Lee*, 227 F.3d 1214, 1226 (9th Cir. 2000) (acting on and sharing information about government activity is "paradigmatically protected by

35

the First Amendment"); *Price v. Garland*, 45 F.4th 1059, 1070–71 (D.C. Cir. 2022) ("Filming a public official performing public duties on public property implicates unique first amendment interests" because "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'") (internal citations and quotations omitted). Defendants do not appear to contest this element.

### B. Defendants Took Adverse Action Sufficient to Deter a Person of Ordinary Firmness

Defendants contend that their public statements were mere "government criticism" of Plaintiffs' speech and therefore cannot constitute adverse action. Defs.' Mem. at 24–27. This argument collapses the distinction between criticism and threats of prosecution — a distinction the law has long recognized.

It is true that government officials may criticize a citizen's speech without violating the First Amendment. But the First Amendment is violated when government officials go beyond criticism and threaten adverse government action, including criminal prosecution, in response to protected speech. *See Bantam Books*, 372 U.S. at 67 ("the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" can violate the First Amendment). The D.C. Circuit recently confirmed this principle, adopting the "objective ordinary firmness test" requiring plaintiffs to "allege that the retaliatory acts of the defendants adversely affected them." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 581 (D.C. Cir. 2025) (internal citation and quotation omitted).

Here, Defendants' statements meet this test. They were not criticism; they were clear and objective threats of potential criminal prosecution directed at Plaintiffs by officials with the power to carry them out:

36

- **Then-Attorney General Bondi's** statement on national television — "He's giving a message to criminals where our federal officers are. And he cannot do that. And we are looking at it, we are looking at him, and he better watch out, because that's not protected speech." — is  not a policy disagreement. It is the Attorney General of the United States telling a named citizen that he is under investigation and warning him that his speech is criminal.

- **Then-Secretary of Homeland Security Noem's** public post that ICEBlock "sure looks like obstruction of justice" and her statement to reporters that DHS was "working with the Department of Justice to see if we can prosecute," is not mere criticism. It is the Secretary of Homeland Security announcing coordination with DOJ to bring criminal charges.

- **Defendant Lyons's** statement that ICE was coordinating with DOJ "as far as prosecuting anyone that has impeded or interfered with ICE arrest. So that's what we're focusing on now with the Department of Justice — to see exactly what we can do." — is not commentary. It is the Acting Director of ICE announcing an active effort to identify criminal charges and bring them against Aaron.

- **Defendant Homan's** comment that "DOJ is looking at it…. So, I think DOJ will come to the point where these people will be held accountable…. I know Pam Bondi is all over it," is not a statement of opinion. It is the White House Border Czar confirming that the DOJ is actively pursuing the matter.

The line between criticism and retaliation is crossed when officials "intimat[e] that some form of punishment or adverse regulatory action would follow." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009). Each of Defendants' statements does precisely that.

The adverse effects on Plaintiffs were concrete and documented. Plaintiff Aaron retained criminal counsel, switched to encrypted communications, altered his international travel, and abandoned development of an Android version of ICEBlock. Amend. Compl. ¶¶ 109, 135. Under the D.C. Circuit's objective ordinary firmness test, these are precisely the kinds of adverse effects that establish the second element. *See Media Matters*, 138 F.4th at 581 (finding adverse effects where journalist limited communications and self-censored articles). Plaintiff ALL U Chart has been unable to update or create new features for ICEBlock, including an update Aaron planned for October 2025, Amend. Compl. ¶ 131, or to obtain distribution of ICEBlock to new iPhone users in the Apple App Store, *id.* ¶¶ 131–34, or on any other platform in the United States, *id.* ¶ 134.

ALL U Chart's core intellectual property has also been falsely publicly accused of facilitating "violent attacks on law enforcement officers" by government officials, *id.* ¶ 106, further undermining ALL U Chart's ability to access platforms and/or channels of distribution for ICEBlock. And the government's retaliation against Aaron has likewise injured ALL U Chart. In sum, the government's actions have deprived Plaintiff ALL U Chart of the ability to control, alter, or amplify ICEBlock—ALL U Chart's speech—and have deterred ALL U Chart's sole developer from speaking, just as the government intended.

## C. Plaintiffs Have Plausibly Alleged a Causal Link Between Their Protected Speech and Defendants' Adverse Action

The causal link between Plaintiffs' protected speech and Defendants' retaliatory threats is plausibly alleged by the Defendants' own words and the temporal sequence of events.

On June 30, 2025, CNN aired a feature about ICEBlock. Amend. Compl. ¶ 93. Within hours, all four Defendants launched a coordinated campaign of public threats directed at Aaron, ICEBlock and CNN. *Id.* ¶ 97. The temporal proximity alone supports an inference of causation. *Harrison v. Fed. Bureau of Prisons*, 298 F. Supp. 3d 174, 183 (D.D.C. 2018) (finding "[t]hat temporal relationship is sufficient to allege causation at this early stage of the litigation.") (citing *Banks v. York*, 515 F. Supp. 2d 89, 112 (D.D.C. 2007)).

But the Amended Complaint alleges far more than temporal proximity. Defendants' own statements identify Plaintiffs' speech as the trigger for their threats. Then-Attorney General Bondi explicitly referenced Aaron's creation of ICEBlock as the basis for her warning. Amend. Compl. ¶ 101. Then-Secretary Noem identified the CNN feature as the catalyst for DHS's coordination with DOJ. *Id.* ¶ 105. Lyons and Homan both referenced the ICEBlock app and CNN's coverage as the basis for their calls for prosecution. *Id.* ¶¶ 98–100. When the defendants themselves identify

38

plaintiff's protected speech as the reason for their adverse action, causation is established on the face of the complaint.

The retaliatory motive is further confirmed by then-Attorney General Bondi's explicit viewpoint-based distinction. She praised Fox News for "warning" about ICEBlock while condemning CNN for "promoting" it — identical coverage of the same app, treated differently based solely on the speaker's perspective. Amend. Compl. ¶¶ 102–103. This is the hallmark of viewpoint discrimination: identical speech is treated differently based on the speaker's perspective. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). If then-Attorney General Bondi's concern were genuinely about officer safety, she would object to all coverage of ICEBlock. That she distinguished based on viewpoint is powerful evidence that her threats were motivated by disagreement with Plaintiffs' speech, not by legitimate law enforcement interests.

The D.C. Circuit requires but-for causation — a plaintiff must show that the "constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (internal citations and quotations omitted). Here, the but-for causation is self-evident: Defendants' threats were made in direct, immediate response to Plaintiffs' speech.

### D. Defendants' Characterization of Their Statements as "Government Speech" Is Unavailing

Defendants rely on *Penthouse International, Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991), and *Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986), for the proposition that government criticism of a citizen's speech cannot constitute adverse action. Defs.' Mem. at 26. But those cases are readily distinguishable.

In *Block*, the government categorized a film as "propaganda" based on its content. 793 F.2d at 1311-15. In *Penthouse International*, the Attorney General's Commission on Pornography sent

a letter identifying companies as alleged distributors of pornography. 939 F.2d at 1013. In both cases, the government arguably expressed an opinion about the content of speech. Neither case involved government officials publicly threatening criminal prosecution of a named individual.

Here, Defendants did not merely express disagreement with ICEBlock's content. They publicly accused Plaintiffs of criminal conduct, announced that Aaron was under investigation, warned him to "watch out," and coordinated with DOJ to determine "exactly what we can do" to prosecute. Amend. Compl. ¶¶ 98–101, 104–105. This is not protected government speech — it is the deployment of the government's coercive power to punish and deter protected expression.

The Tenth Circuit's recent decision in *Tachias v. Sanders*, 130 F.4th 836 (10th Cir. 2025), is instructive. There, a school superintendent sent cease-and-desist letters threatening litigation against citizens who operated a Facebook page critical of the school district. *Id.* at 839. The court reaffirmed its prior holding that "government actors violate the First Amendment when they threaten frivolous legal actions in retaliation for a person's constitutionally protected speech." *Id.* at 839–40 (citing *Beedle v. Wilson,* 422 F.3d 1059 (10th Cir. 2005)). The court relied on *Bantam Books* for the principle that "even the mere threat of retaliatory litigation can unconstitutionally chill speech." *Tachias,* 130 F.4th at 847 (citing *Bantam Books*, 372 U.S. at 64). If a school superintendent's cease-and-desist letter constitutes adverse action, then the Attorney General's public declaration that a named citizen is under investigation and should "watch out" does so, too.

For all of these reasons, the Amended Complaint states a viable First Amendment retaliation claim, and the motion to dismiss Count Two on the merits should be denied.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

Dated: New York, New York
     April 17, 2026

                                                Respectfully submitted,

                                                */s/ Noam Biale*

David E. Greene (pro hac vice)     Noam Biale, DC Bar No. NY0459
F. Mario Trujillo, DC Bar No. 1672880     Deirdre von Dornum, DC Bar No. NY0696
Aaron Mackey, DC Bar No. 1017004     Justin J. Gunnell†
                                              Alexandra Conlon†

**ELECTRONIC FRONTIER**
**FOUNDATION**                        **SHER TREMONTE LLP**
815 Eddy Street                    90 Broad Street, 23rd Floor
San Francisco, CA 94109           New York, NY 10004
                                              (212) 202-2600
(415) 436-9333                    nbiale@shertremonte.com
davidg@eff.org                    dvondornum@shertremonte.com
mario@eff.org                     jgunnell@shertremonte.com
amackey@eff.org                  aconlon@shertremonte.com

                                              *† Application for Admission Pro Hac Vice*
                                              *forthcoming*

                                        *Attorneys for Plaintiffs*